## Appeal of the Pennsylvania Lead Company.

1. Where a business complained of is a dangerous nuisance and the injury is continuous and cumulative and the mischief irreparable, a court of equity will enjoin the prosecution of such business.

2. Where it appears that works for smelting lead are of such a character and the injury inflicted of such nature a court of equity will restrain their use.

November 5th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, TRUNKEY, STERRETT and GREEN, JJ. PAXSON, J., absent.

Appeal from the Court of Common Pleas, No. 1, of *Allegheny county*: Of October and November Term 1880, No. 50. In Equity.

Bill in equity filed by Joseph P. McIntyre against the Pennsylvania Lead Company.

The bill in substance alleged: 1. That complainant has owned, since April 12th 1871, a certain farm, situate in Robinson township, in Allegheny county, containing about forty-six acres. 2. That prior to the unlawful acts of the defendant complained of, the said farm was a fertile tract, and used for farming purposes. 3. That some time in the year 1873, the defendant corporation acquired a piece of land adjoining said farm on the westerly side thereof, and erected thereon smelting works, for the smelting of lead and other minerals; said works being located within about seventy-five feet of the said farm. 4. That shortly after the completion of said works, the defendant company commenced operating the same for the smelting of lead and other minerals, and has since continued so to do, and intends so to do in the future. 5. That the said works are so constructed and operated as to emit from the stacks and chimneys thereof offensive, noxious and poisonous gases, fumes and vapors; and are so located that said gases, fumes and vapors descend and rest upon said farm. 6. That the said gases, fumes and vapors have injuriously affected and are injuriously affecting said farm; that they have poisoned and are poisoning the soil and the vegetation and products of said farm, rendering the latter unfit for consumption; that portions of said farm have already been blasted and rendered barren, and the vegetation thereon destroyed; and this mischief is continuous, and will continue so long as the defendant's said works are operated as aforesaid. 7. That the said gases, fumes and vapors are injurious to cattle grazing upon said land or eating the products thereof; and plaintiff is informed and believes that horses and cattle have died from grazing and eating the fodder from said farm, poisoned by the gases, fumes and vapors aforesaid. 8. That the gases, fumes and vapors aforesaid are noxious to persons living upon said land or inhaling the same. 9. That said works emit smells which are offensive and intolerable to persons residing on said farm. 10. That the said works are a con-

tinuing nuisance to said farm, and are producing, and will continue to produce, irreparable injury. 11. That at the time said works were being erected, plaintiff was not fully informed as to the uses to which they were to be put, nor had he any knowledge as to how they were to be operated, and he then had no personal experience as to the effect produced by such works; and it was not until the defendant's works had been in operation for some considerable time that he discovered the full effect from the gases, fumes and vapors aforesaid; and it is only within a period of a few weeks that he has learned, from chemical analyses of the soil and vegetation of his farm, the extent to which they are being poisoned.

Equitable relief was prayed for: 1. That it be decreed that the defendant abate the nuisance complained of. 2. That the defendant company be restrained by the order and injunction of this honorable court from operating its smelting works in such manner as harmfully or injuriously to affect the plaintiff's farm or the vegetation thereof, and from allowing or permitting the gases, fumes or vapors from said works to descend or fall upon said farm. 3. General relief.

The defendant's answer in brief was: 1. That the allegations contained in the first paragraph of said bill are true. 2. That the allegations contained in the second paragraph of said bill are substantially true; though only a portion of said farm is a fertile tract and used for farming purposes, the remaining portion being unfit therefor. 3. That the allegations contained in the third paragraph of said bill are true, except in this: that the defendant company's works are distant some five or six hundred feet from the plaintiff's dwelling. 4. That the allegations contained in the fourth paragraph of said bill are true. 5. The averments of the fifth paragraph of said bill the defendant company denies, and in this connection avers that its works are constructed after the most approved method, and with special reference to a prevention of any injury or damage to surrounding and neighboring property; and denies that from the operation of said works any injuries have resulted, do, or will result to the plaintiff. 6. That the averments contained in the sixth paragraph of said bill are not true. 7. That it is not true that there are any gases, fumes and vapors produced by the operation of defendant's works, which are injurious to cattle grazing upon the plaintiff's land and eating the products thereof; nor is it true that horses and cattle have died from grazing and eating fodder from said farm, because of any effect had thereon by the proximity of defendant's works thereto, or their operation. 8. And defendant company denies the allegations contained in the eighth paragraph of said bill. 9. It further denies the allegations contained in the ninth paragraph of said bill. 10. It further denies the allegations contained in the tenth paragraph of said bill. 11. That it is not true, as averred in the eleventh paragraph of said

bill, that at the time said works were being erected, the plaintiff was not fully informed as to the uses to which they were to be put; but on the contrary, as defendant avers, the said plaintiff had full knowledge of the contemplated erection of said works, and was for a time in negotiation with the defendant company with a view to selling to it the whole or a portion of his said property for the purposes of said works. That during the time the said works were in process of erection, said plaintiff had daily knowledge of what was going on, saw the result of the expenditure of large sums of money made by defendant, in the putting up of said works, and has from that time until the present, had a continuous experience as to the operations carried on by the defendant. It is not true that the soil and vegetation of the plaintiff's farm is or has been in any wise affected by any gases, fumes and vapors from defendant's works. 12. That the said works have been erected at an expense of about $140,000; that this expense was incurred with the knowledge of the plaintiff, and without objection or protest upon his part; that the said works are perhaps the best constructed works of the character in the United States; that the defendant company employs in said works an average of from sixty to seventy-five men daily, who reside in the vicinity thereof, and manufactures large quantities of lead, which it supplies to the trade in the city of Pittsburgh, and ships to other places; that the interference with the operation of said works would result in great loss and damage to the defendant company, and to the trade of the city of Pittsburgh, and that so far from the existence and operation of said works producing any damage to the plaintiff, it is a fact that his said property is now by him rented, and has been for some time past, for a much larger sum than it was at the time said works were originally erected. 13. And the defendant company denies that the said plaintiff has sustained any damage, or is likely to sustain any damage, by reason of the erection and operation of defendant's works, in any way, and that he has sustained, does, or will sustain any damages for which he has not a complete and adequate remedy at law.

The master, to whom the case was referred, Jacob H. Miller, Esq., found the facts as follows:

1st. That the plaintiff is the owner in fee simple of a farm of 46 acres and 8 perches of land, situate near Mansfield, in Robinson township, Allegheny county, with farm house and buildings thereon, on the line of the Pittsburgh, Cincinnati and St. Louis Railway, at a distance of seven miles from the Union depot, in the city of Pittsburgh. This farm was purchased by him on April 12th 1871, for $21,000. The plaintiff has not resided on his farm, but has leased it to farmers and croppers. 2d. That the defendant's real estate consists of nearly nine acres of land adjoining the farm of the plaintiff. The line bounding defendant's land upon the south

is coincident with the plaintiff's northerly line, and is the centre of the roadway of the railway, which separates the two tracts as used and occupied. Both tracts are bounded on the east by Chartiers creek, and a large portion of each is creek bottom, but the western portion of both, where the buildings are located, is elevated about fifty feet above the bottom land, and falls off gradually toward it. 3d. That in the spring of 1873, the defendant company commenced the erection of lead smelting works upon their land, near the railroad, within seventy-five feet of the plaintiff's land, and five hundred or six hundred feet from his farm house. The erection of the works occupied about seven months, but new erections and changes have been since made. The buildings and ground have cost $140,000. 4th. That the works were originally constructed for the smelting of ores and the production of soft lead, silver and whatever metals are of value in the ores received by the company, and for the refining of crude furnace lead bullion, produced from ores found in the western territories, which ores contain silver and gold, as well as lead. Since May 1877, the exclusive business of defendants has been the branch last named, viz.: The refining of crude furnace lead bullion and the production of merchantable lead, gold and silver. The defendant's works have a larger capacity than any other lead works in the country, viz.: 14,000 to 15,000 tons of soft lead a year, and are now producing one-fifth of the whole lead product of the United States. Their furnaces and other appliances are abreast of the times as to improvements, and every precaution has been taken for the prevention of the escape of lead from their flues known to the most expert in the business. The amount of the lead produced, and the value of the lead, silver and gold produced by the defendant since commencing operations, are as follows:

| In 1873, lead, | 223 tons; value | $94,293.62 |
|---|---|---|
| " 1874, " | 395 " " | 129,056.61 |
| " 1875, " | 2,641 " " | 745,779.52 |
| " 1876, " | 3,694 " " | 975,144.63 |
| " 1877, " | 8,934 " " | 1,703,840.79 |
| First 6 months of 1878, lead 6,417 tons; " | | 1,111,772.73 |

5th. That the plaintiff's land and the defendant's works are located in a farming district; but on the tract immediately westward of the defendant's land, is located the Mansfield Coal and Lime Company, whose coke ovens are near the lead works, and on the same side of the railroad. The railroad is between the ovens and the western portion of the plaintiff's farm. 6th. That prior to the time defendant's smelting operations began, the plaintiff's land was fertile and well adapted to farming and grazing. 7th. That the defendant's works emit from the chimneys and stacks thereof (in the processes of smelting ores and refuse and desilvering lead),

offensive and poisonous fumes and vapors, which are blown upon, descend and rest upon the plaintiff's farm; and that lead is thus distributed over said farm to a distance of at least fifteen hundred feet from said works.    8th. That these lead fumes and vapors have injuriously affected, and are injuriously affecting the plaintiff's farm.   That they have lessened the fertility of a portion of the farm lying nearest to the lead works; that they have poisoned and ·are poisoning the vegetation and products of said farm, rendering the latter unfit for consumption; and that these injuries are still continuing.   9th. That horses and cattle grazing upon the plaintiff's farm and eating the products thereof, have died from lead poisoning, and that the lead was communicated to them through the herbage and fodder on which they fed.   That the horses and cows of Jacob· Wehrle, who was the tenant of the plaintiff from April 1st 1875 to April 1st 1876, and those of his son, Frederick Wehrle, that died upon the plaintiff's farm, were poisoned in the manner above stated.   10th. That since April 1st 1876, the only crop cultivated upon the farm is corn, which is husked on the stock and the fodder left on the ground; and no horses, cattle or live stock of any kind are reared or pastured on the farm.   11th. That the fumes and vapors from the defendant's works are offensive and nauseating to persons living upon the land or inhaling them.   12th. That the plaintiff's farm is greatly diminished in value by reason of the lead deposited and being deposited upon it from the defendant's works.   Its rental value is also greatly depreciated.   13th. That the lead works of the defendant are a nuisance to the plaintiff's farm.

Upon the whole case, law and fact, the master is of opinion that the plaintiff is entitled to the relief prayed for by the second paragraph of his prayer, and so reports.

Exceptions were filed to this report, and after argument thereon the court, Stowe, P. J., filed the following opinion :

" The defendants' interest in the maintenance of their works is such, and the public is so much concerned in the same result, that I have felt it my duty to scan, not only closely but critically, the evidence in the cause, with the purpose of escaping, if possible, from the conclusion arrived at by the master.   After a very careful examination of the whole case, I am compelled to concur entirely with his findings of the facts, and see no way of avoiding the result indicated by him, without palpably disregarding the principles established by judicial authorities and decisions, not only in England but in this country as well.

"From the first I could see no hope for defendants, except it might be in the application of the principles· laid down by Chief Justice THOMPSON, in Richards's Appeal, 7 P. F. Smith 105, where he says : ' A decree in equity is never of right, but of grace.   Hence, the chancellor will consider whether he would not do a greater

injury by enjoining than would result from refusing and leaving the party to his redress at the hands of a court and jury. If, in conscience, the former should appear, he will refuse to enjoin.'

"Were it not for the dangerous quality of the 'fumes' thrown out by defendants' works, which certainly affect growing vegetation, so as to make it not only unfit for food, but when eaten, destructive of animal health and life; and for the extremely nauseous character of the effluvia emitted, and the evident uncertainty at what point that which is now shown to be merely offensive to the senses may begin to be pernicious, I could, most probably, have been content to refuse the injunction prayed for, and have remitted the plaintiff to his action at law, to recover such damages as he might show had accrued to his real estate, by reason of injury to its productive capacity or general value for farming purposes.

"But these are disadvantages and injuries incident to risks arising from the peculiar character of the fumes emitted, which will not admit of compensation, and the possibility, if not probability, that the health and personal safety of persons living upon plaintiff's land will sooner or later be involved, renders the case such that I am constrained to agree with the master, and conclude that a decree such as he recommends should be made."

From this decree this appeal was taken by defendant, which alleged that the court erred in sustaining the master's findings of fact. In finding that the plaintiff is not estopped from maintaining this proceeding. In deciding that an injunction can issue in this case without a previous trial at law. In deciding that the plaintiff has not an adequate remedy at law for any grievance disclosed by the evidence. In not refusing to enjoin the defendant on the principle that when greater injury would ensue by enjoining than by leaving a party to his redress by a court and jury, equity will refuse to interfere. In the decree made enjoining the defendant.

*Hampton & Dalzell*, for appellant.—Taking the plaintiff at his word, what injury and damage has he suffered? 1. The loss of certain live stock and corn fodder (of his tenants). 2. Two acres of his land have been blackened, and a portion rendered unfit for certain uses—that of pasturage and the raising of certain kinds of crops. That damage in neither of these ways, nor in both together, will justify the abatement of defendant's works by chancery process, is apparent from the following well-recognised principles:

1st. An injunction will not issue when the plaintiff has an adequate remedy at law. 2d. Equity will not abate a work erected and in operation on the ground that it is a nuisance, without a previous trial at law; although it may interfere in the first instance to prevent such erection. 3d. While an action at law is matter of right, an injunction is of grace; and the rule in cases of this character requires the court to balance the inconvenience likely to

be incurred by the respective parties and the public by means of the action of the court, and, when greater injury would ensue by enjoining than by leaving the party to his redress at law, to refuse the injunction. And under the evidence we may invoke the further principle that his laches estops the plaintiff from the relief he seeks.

In balancing the scales of advantage and disadvantage to public and private interests, do they go down upon the side of the plaintiff, so that the penalty for his loss of pasturage shall be the destruction of defendant's enterprise and capital, the dismissal of their workmen, and the loss of hundreds of thousands annually to the people of Pittsburgh? Shall one-fifth the entire lead product of the United States cease to enter the market because Mr. McIntyre's forty acres have fallen in value; or because, at some time or other, it may possibly be that somebody shall be poisoned on his farm? Shall the largest business in Pittsburgh, in dollars and cents, cease to be, because it is not lawful, even seven miles from its limits, to manufacture lead? The doctrine of Richards's Appeal, *supra*, has never been shaken or qualified by this court. On the contrary, it has often been affirmed; notably so in a case very much like the one under discussion: Huckenstein's Appeal, 20 P. F. Smith 102.

We submit, as legitimate conclusions from all the evidence, that whether plaintiff has sustained any damages from defendants' works is at best doubtful. That even if damages have been sustained, they are capable of compensation in an action at law. That the only damage not of this character anywhere suggested in the case, is eventual and contingent. That the disadvantages to result from the decree are far greater than any that can possibly result from its refusal.

*George Shiras, Jr., T. H. Baird Patterson* and *M. W. Acheson*, for appellee.—Whatever may be found in the earlier cases to the contrary, it is now firmly settled that courts of equity will grant injunctions without a previous trial at law: Denny v. Brunson, 5 Casey 382; Scheetz's Appeal, 11 Id. 88. It was distinctly ruled that the court is not bound by the verdict of a jury, and will not direct an issue before granting an injunction: Dennis v. Eckhardt, 3 Grant 390; Masson's Appeal, 20 P. F. Smith 26; Weir's Appeal, 24 Id. 230; Somers's Appeal, 6 W. N. C. 442. This also was a case of nuisance, and the point distinctly made that there should have been a previous trial at law. It is only where the right or title of the plaintiff is denied and disputed, as in Rhea v. Forsyth, 1 Wright 503, that a trial at law is ever necessary before an injunction will issue.

In the present case the nuisance was a serious and continuing one, and was clearly one for equitable relief. The cases of Richards's Appeal, 7 P. F. Smith 105; Rhodes v. Dunbar, Id. 274,

and Huckenstine's Appeal, 20 Id. 102, do not rule the present case. The injuries complained of in those cases were very different from the grievances which afflict the plaintiff here. The princ ples admitted in the several opinions in those three cases call for equitable relief here. Any business, however lawful in itself, which as to those residing in the neighborhood where it is carried on, causes annoyances that materially interfere with the ordinary physical comfort of human existence and with the enjoyment of property, is a nuisance which will be restrained: Cleveland et al. v. The Citizens' Gaslight Co., 6 C. E. Green's N. J. Eq. 201; Babcock v. New Jersey Stock Yard Co., Id. 296; Catlin v. Valentine, 9 Paige (N. Y.) 575. A smelting-house is a nuisance at common law: Kerr on Injunctions *362, sect. 2.

There is a wide distinction between the ordinary cases, cited on behalf of the appellants, where merely smoke and noise are complained of, and the case of a factory continually emitting poisonous fumes and vapors destructive to life and vegetation. It is insisted that to sustain the decree of the court below will be to destroy the appellant's works, and the magnitude and importance of the business are dwelt upon. But such would by no means be the result. It is entirely practicable to erect and maintain suitable flues, stacks and chimneys to carry off the poisonous fumes, as is done in other countries where such works are carried on. Or the appellant can, for a comparatively small sum, possess themselves of the adjacent lands that suffer from the poisonous deposits. The recent and twice-considered case of Sanderson v. The Pennsylvania Coal Co., 5 Norris 401, is, we submit, conclusive authority in our favor, both in respect to what constitutes a nuisance and the right to a remedy in equity.

Mr. Justice GORDON delivered the opinion of the court, January 3d 1881.

The power of the Courts of Common Pleas of Pennsylvania to entertain bills for the restraint or abatement of nuisances, where they affect private rights, is undoubted; neither is the exercise of this power prevented by the fact that the party complaining may have a remedy by indictment or by an action at law: Bunnell's Appeal, 19 P. F. Smith 59; Dennis v. Eckhardt, 3 Grant 390. It is true, indeed, that this power is limited to those cases where common-law forms of action do not furnish an *adequate* remedy, and the chancellor may also refuse to act where greater injury would result from an injunction than by leaving a party to his redress before a court and jury : Richards's Appeal, 7 P. F. Smith 105. But where, in ordinary parlance, the damage sought to be pervented is irreparable, that is, where the wrong is repeated from time to time, or is of a continuing character, or productive of dam-

ages which cannot be measured by ordinary standards, equity may be invoked: Commonwealth *v.* Railroad Co., 12 Harris 159.

The appellant, however, contends that an injunction ought not to issue until the complainant's right has been established by an action at law. This suggestion would, in a doubtful case, have force, for the chancellor, in a case like the present, will act only when he can do so without hesitancy. If the case be doubtful he will refuse to interfere until the right, upon which the claim for relief is based, is definitely settled by trial on the common-law side of the court. But to say that equity cannot move in any case until a jury has determined the nuisance to be an existing fact, is to·make our equity system a mere dependent on the common-law courts, and its jurisdiction servient and inferior. But a conclusion such as this does not accord with the intent of the Act of 1836, for by it the judges of the Common Pleas are clothed not with partial and dependent, but with full and and independent chancery powers over all the subjects therein mentioned. We may then adopt the language of Earl, J., in Campbell *v.* Seaman, 63 N. Y. 568, when speaking of injunctions against nuisances: "It was formerly rarely issued in the case of a nuisance until the plaintiff's right had been established at law, and the doctrine which seems now to prevail in Pennsylvania, that the writ is not a matter of right but of grace to a large extent prevailed. But a suit at law is no longer necessary, and the right to an injunction in a proper case in England and most of the states is just as fixed and certain as the right to any other provisional remedy. The writ can rightfully be demanded to prevent irreparable injury, interminable litigation, and a multiplicity of suits, and its refusal in a proper case would be error to be corrected by an appellate jurisdiction. It is a matter of grace in no sense except that it rests in the sound discretion of the court."

Nor have our own courts been less ready to adopt the same doctrine; hence, it has been held that an injunction would be issued to prevent the cutting down of timber and ornamental trees to the injury of the reversion: Denny *v.* Brunson, 5 Casey 382; or to restrain a trespass of a permanent or continuing character: Masson's Appeal, 20 P. F. Smith 26. So may acts of trespass or nuisance be restrained to prevent a multiplicity of suits, or where such wrongful acts might become the foundation of an adverse right: Scheetz's Appeal, 11 Casey 88.

Nor do we understand how Richards's Appeal can help the defendant; for while no one disputes the position that a bill for suppression of a nuisance may be dismissed on general demurrer for· want of equity, unless it appears from the subject-matter affected by the alleged nuisance that there is danger of irreparable mischief, or of an injury such as cannot be adequately compensated ·in a suit at law, yet, we apprehend, even under this authority, a general demurrer would scarcely have sufficed to turn the bill before

us out of court.   In it we find then several allegations; that the defendant's works are so constructed as to emit noxious and poisonous gases, fumes and vapors, and that they are so located that these noxious and poisonous gases fall upon the plaintiff's land, thereby poisoning and destroying both soil and vegetation; that cattle and horses have died from eating the fodder and herbage thus poisoned; that these fumes and vapors are offensive and noxious to persons resident upon said farm, and that these injuries are continuous and irreparable.   It would certainly be a very bold solicitor who would risk the admission of such facts on a general demurrer, and it is a significant fact that the learned counsel for the defendant have attempted no such experiment.

The bill, then, is sufficient to evoke the action of a court of equity, and all that remains is to ascertain if the bill be supported by the evidence.   As to this, after a careful examination of the testimony, we conclude that the findings of the master are correct, and that the complainant's complaint is fully sustained by the proofs.   And indeed, it is to be remembered, *in limine*, that whether a smelting-house for lead is or is not a nuisance *per se* to adjacent land depends very much upon its situation.   " If," says Blackstone, " one erects a smelting-house for lead so near the land of another that the vapor and smoke kill his corn and grass, and damage his cattle therein, this is held to be a nuisance."   All intelligent persons are aware that lead vapors are poisonous, and this the more so as they are often, as in the case in hand, accompanied with arsenic.   In this matter we need not chemists and experts to teach us, for common experience is sufficient.   When, therefore, we learn that the works of the defendant are to the windward of the plaintiff's land, within seventy-five feet of his northern line, and but five or six hundred feet from his farmhouse, we need but little evidence to satisfy us that the smoke from these works is seriously injurious to his property.   But in addition to what we might naturally expect from the design and character of this business, and which might in themselves have been sufficient to have sustained a bill to restrain the erection of these works, we have the findings of the master, based on undoubted testimony, as follows:  " That prior to the time the defendant's smelting operations began the plaintiff's land was fertile and well adapted to farming and grazing.   That the defendant's works emit from the chimneys and stacks thereof, in the process of smelting ores and refuse and desilvering lead, offensive and poisonous fumes and vapors, which are blown upon, descend and rest upon the plaintiff's farm, and that lead is thus distributed over said farm to a distance of at least fifteen hundred feet from said works.   That these lead fumes and vapors have injuriously affected and are injuriously affecting the plaintiff's farm; that they have lessened the fertility of a portion of the farm lying

nearest the lead works; that they have poisoned and are poisoning the vegetation and products of said farm, rendering the latter unfit for consumption; and that these injuries are continuing. That horses and cattle grazing upon the plaintiff's farm, and eating the products thereof, have died from lead poisoning, and that the lead was communicated to them through the herbage and fodder on which they fed; that the horses and cows of Jacob Wehrle, who was tenant of the plaintiff from 1st April 1875 to April 1st 1876, and those of his son Frederick Wehrle that died upon the plaintiff's farm were poisoned in the manner above stated; that since April 1st 1876 the only crop cultivated upon the farm is corn, which is husked on the stalk and the fodder left on the ground; and no horses, cattle or live stock of any kind are reared or pastured on the farm; that the fumes and vapors from the defendant's works are offensive and nauseating to persons living upon the land or inhaling them; that the plaintiff's farm is greatly diminished in value by reason of the lead deposited and being deposited upon it from the defendant's works. Its rental value is also greatly depreciated.''

To this he might well have added that the plaintiff's farm was thereby rendered not only uncomfortable but dangerous as a place of human habitation; for a place where not only the herbage and ground are so literally poisoned by deposits of lead that it is readily discoverable by chemical analysis, but where at times also the air is so filled with the noxious vapors of lead and arsenic as to make those sick who encounter them, might certainly be called dangerous to human health and life.

In this connection another important circumstance must be considered; that is, the cumulative character of this injury. It increases from year to year, not only as the works are enlarged, but as more and more lead is added to the ground. The deposit is an indestructible metal that is neither evaporated nor absorbed, and necessarily it must accumulate as long as the cause of the deposit continues. Hence, as it was observed at first, even on the land nearest the works, the effect was scarcely observable, but as time went on it became more and more apparent until finally the soil was wholly unfitted for agricultural purposes. So, in like manner, may these blighting influences continue until the whole farm is made barren and unproductive. Thus it is that we find in this case every element necessary to call forth the exercise of equity powers. The business complained of is a dangerous nuisance; the injury continuous and cumulative, and the mischief irreparable. If, as in Dennis *v.* Eckhardt, 3 Grant 390, a tin shop was enjoined on account of its noise, or as in Campbell *v.* Seaman, the use of a brick kiln was restrained because the vapor therefrom was destructive to the plaintiff's trees and vines, much more should a business be enjoined which is destructive alike to vegetable and animal life.

[Pennsylvania Lead Co.'s Appeal.]

The rule *sic utere tuo, ut alienum non lædas* is a most valuable one, and must be maintained if our civilization is to be cherished and preserved, and it is not at all to the purpose to answer the charge of a violation of this rule that the defendant's works have been erected at a great outlay of capital; that they are important to the public at large, and give employment to many men. Says Wood, in his work on Nuisances, sect. 794: "A person cannot go on and build extensive works and make heavy expenditures of money for the exercise of a trade or business that will invade the premises of another with smoke, noxious vapors or noisome smells, to an unwarranted or unlawful extent, and then when called upon to desist turn around and claim immunity for his trade or business on the ground that to stop it would involve him in ruin, nor that it is a necessary result of carrying on his trade at all, and that he has adopted the most approved methods known to science, or which human skill has devised, nor that his trade is a useful one and beneficial to the community, or to the nation, or that by bringing a large number of workmen into the community it has enhanced the value of the plaintiff's property." Where justice is properly administered rights are never measured by their mere money value, neither are wrongs tolerated because it may be to the advantage of the powerful to impose upon the weak. Whether it be the great corporation with its lead works, or the mechanic with his tin shop, the rule is the same: "So use your own as not to injure another." Moreover, there is, after all, one underlying principle which influences both, and that is private gain. Lead works and tin shops alike may result incidentally in the public good, but this is only an incident, for the primary object which induces the exercise of either trade is personal good; therefore to neither party is the general community under any special obligation, and as a consequence there is no good reason why the rules of law should be relaxed in the one case rather than the other.

Again, we cannot but regard this company as unfortunate in the selection of a place for the erection of its works. To undertake the business of lead smelting in the midst of a rich suburban valley, occupied by farms and country residences, was, to say the least of it, not very prudent. Lord Cranworth, in the case of the St. Helen's Smelting Co. *v.* Tipping, 11 H. L. Ca. 652, quoting Mr. Justice Mellor, says: "It must be plain that persons using a limekiln, or other works which emit noxious vapors, may not do an actionable injury to another, and that any place where such an operation is carried on so that it does occasion an actionable injury to another, is not, in the meaning of the law, a convenient place." If, however, any place is improper for a business of this kind where injury may result from it to others, surely a situation like that selected by the defendant ought, in the outstart, to have been regarded as improper, since common knowledge and prudence

should have informed its managers that injury, sooner or later, must result to the adjacent property.

But it is insisted that the plaintiff has no equity, as against this company, because he gave it no notice before or at the time of the erection of its works. But of what would he give it notice? Of the effect the fumes would have upon his farm? But the master has found that he knew nothing of lead works and their probable effect on adjacent land; he could not, therefore, notify it of that of which he was ignorant. One would suppose that on this matter the managers of the corporation would be fully posted; if they were so posted, if they knew what the effect would be upon the surrounding property, then they acted with knowledge wantonly, and notice to them was unnecessary; but if they were ignorant, if they knew not the consequences which would follow the business in which the company was about to engage, then they ask too much of the plaintiff when they require of him a knowledge of their own business which they themselves did not possess.

Decree affirmed.