## Sullivan, Appellant, v. Jones & Laughlin Steel Company.

*Equity—Injunction—Trespass—Nuisance—Dust from iron furnace—Irreparable injury—Multiplicity of suits.*

If an injury is continuous and remediable at law only by a multiplicity of suits, it can well be regarded as an irreparable one, calling for the interference of equity by the exercise of its restraining powers.

A manufacturing concern located in a manufacturing district of a city cannot so operate its works as to actually destroy homes and other property in a residential locality in the same city.

While a chancellor acts as of grace, such grace sometimes becomes a matter of right to the suitor in his court, and, when it is clear that the law cannot give protection and relief—to which the complainant in equity is admittedly entitled—the chancellor can no more withhold his grace than the law can deny protection and relief, if able to give them.

The right of a man to use and enjoy his property is as supreme as his neighbor's, and no artificial use of it by either can be permitted to destroy that of the other.

On a bill in equity for an injunction it appeared that the defendant, a steel company, occupied in the city of Pittsburg land which its predecessor in title had purchased from one of the plaintiffs. On this land blast furnaces had been erected. The furnaces were at the foot of a bluff, on the top of which was a residential district, in which the properties of plaintiffs were situated. At the time the bill was filed the tops of the furnaces were a little lower and the stacks a little higher than the bluff. Prior to 1901 the district in which the plaintiffs' properties were situated was subject to the smoke and dust from the furnaces and mills at the base of the bluff, but was not subject to ore dust in annoying and injurious quantities. Prior to the filing

of the bill, the defendant rebuilt and greatly enlarged its furnaces, and began to use an ore known as "Mesaba ore" which was of a fine and dustlike quality. Prior to this it had used "Old Range" ore which was coarse and lumpy, and did not give off dust in injurious quantities. The change was made because the Old Range ore was being exhausted. The capacity of the new furnaces was twice or three times that of the old ones. The dust given off by the new furnaces using the Mesaba ore settled on plaintiffs' houses, choked up rain conductors, discolored fabrics and paints, injured carpets and curtains, destroyed fruit and shade trees and vegetation generally, and depreciated the value of the properties more than twenty-five per cent. A number of tenants had been forced to leave the properties, and on one occasion plaintiffs had removed from the porch roofs three barrels of ore dust, the weight of which amounted to twelve hundred pounds. It did not appear that the furnaces were improperly constructed, or that there was any recklessness in their operation. There was evidence that there were appliances patented to prevent the escape of dust, but it was shown that these appliances had not been generally adopted. The material facts in the case were not in dispute. *Held*, that, as plaintiffs' properties were being destroyed, they were entitled to an injunction.

MITCHELL, C. J., FELL and THOMPSON, JJ., dissent.

Argued Oct. 29, 1903. Reargued Feb. 16, 1904. Appeal, No. 94, Oct. T., 1903, by plaintiff, from decree of C. P. No. 2, Allegheny Co., Oct. T., 1902, No. 620, dismissing bill in equity, in case of E. R. Sullivan and Jennie P. A. Sullivan, his wife, v. Jones & Laughlin Steel Company. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT, POTTER and THOMPSON, JJ., on reargument. Reversed.

Bill in equity for an injunction. Before FRAZER, P. J.
The facts appear by the opinion of the Supreme Court.

*Error assigned* was decree dismissing the bill.

*Thomas Patterson* and *James R. Sterrett*, with them *M. W. Acheson, Jr.*, for appellants.—The injury to plaintiff's property being directly the result of defendant's acts or trespasses, the damage being serious, immediate and continuing, and the facts undisputed, equity will interfere by injunction to restrain the injurious act: St. Helen's Smelting Co. v. Tipping, 11 H. L. C. 642; Dennis v. Eckhardt, 3 Grant, 390; Campbell v. Seaman, 63 N. Y. 568; Commonwealth v. P. & C. R. R. Co., 24 Pa. 159; Pennsylvania Lead Company's Appeal, 96 Pa. 116; Appeal of Ladies' Decorative Art Club, 22 W. N.

C. 75; Evans v. Reading Chemical Fertilizing Co., 160 Pa. 209; Gavigan v. Atlantic Refining Co., 186 Pa. 604.

Where there is a substantial injury to a property right, which cannot be redressed except by a multiplicity of suits, the granting or withholding of an injunction is not a matter of grace or a question of the balance of the injury, but follows as a matter of right, when the injury is once shown to exist: Bigler v. Penna. Canal Co., 177 Pa. 28.

The doctrine of the Sanderson cases applies only to those instances in which the defendant is raising minerals from his own property and which, taking all the precautions which he can, cannot be raised without injury to others.

*George C. Wilson,* with him *Wm. D. Evans* and *Clarence Burleigh,* for appellee, cited: Huckenstine's App., 70 Pa. 102; Richards's App., 57 Pa. 105; Wier's App., 74 Pa. 230; Penna. Lead Co.'s App., 96 Pa. 116; Bigler v. Penna. Canal Co., 177 Pa. 28.

OPINION BY MR. JUSTICE BROWN, March 28, 1904:

The material facts in this case, of more than ordinary interest and importance, are not in dispute. They are readily gathered from the court's findings and from testimony which is uncontradicted. In 1859 the appellee's predecessors in title purchased land from Jennie P. A. Sullivan, one of the appellants, and erected furnaces on it. The location of the land at that time was in Pitt township, which has since been annexed to the city of Pittsburg. It lies between the Monongahela river and Second avenue. This avenue runs along the foot of a bluff, on the top of which the properties of appellants are situated, at an average distance of about 1,000 feet in a northerly direction from the furnaces of the appellee. The tops of these furnaces are a little lower and the stacks a little higher than the bluff. The district in which the furnaces are located is, and for many years has been, distinctively and exclusively a manufacturing one, and the district on top of the bluff, where appellants' properties are situated, is, and has been for some time, a residence locality, which has been subject to the smoke and dust from the furnaces and mills along the Monongahela river at the foot of the bluff, but was never sub-

ject to ore dust, in annoying and injurious quantities, until about July 1, 1901. Prior to 1898 the appellee had three furnaces in blast on the sites of the present ones, and, about seven or eight years before this bill was filed, began to use " Mesaba " ore. It had been using " Old Range " ore, the supply of which is being exhausted. The amount of " Mesaba " ore used during the time stated averaged about thirty per cent of the total quantity used. This " Mesaba " ore, brought from Minnesota, is of a fine and dustlike quality. " Old Range " is coarse and lumpy. No complaint is made of the emission and settling of dust upon the properties of appellants when either or both these ores were used prior to 1901.

Between March, 1898, and May, 1901, according to the court's ninth finding, " The three furnaces at that time constituting the Eliza furnaces were rebuilt, improved and enlarged upon the site then and now occupied by them, and a fourth furnace added upon that site. The first of the rebuilt furnaces was ' blown in ' September 1, 1899 ; the second May 13, 1900 ; the third, January 21, 1901, and the fourth on May 8, 1901. These furnaces as re-built, improved and enlarged, are constructed in accordance with modern and approved plans, and in their construction are in every respect equipped with modern appliances and improvements, and are equal, in many respects superior, to other furnaces in this locality in which pig iron is manufactured, and are among the largest known in the iron business, having a capacity each of about 500 tons daily production and consuming together about 4,000 tons of ore daily." The capacity of these new furnaces is twice or three times that of the old ones replaced by them. After the fourth and last furnace was blown in the annoyance and injury began, against the continuance of which relief is sought by this bill.

The escape of dust from blast furnaces in large quantities is due to what is known as a " slip," a definition of which is found in the court's eleventh finding : " The escape of dust from blast furnaces into the atmosphere is, and always has been, incident to their operation. It escapes at all times, but in larger quantities when what is known as a ' slip' occurs in the furnace. In the operation of all blast furnaces ' slips' occur from time to time. These are occasioned by the caking

or encrusting of the ore in the stack of the furnace, and the
falling away of the ore, fuel and limestone beneath the crust
by reason of the continued combustion and the liquefaction
of the iron, thus forming a chamber or vacant space into which
the encrusted ore at the top drops, occasioning an explosion,
the violence of which depends upon the extent of the cavity
produced, and the amount of gas accumulated therein.   ' Slips'
occur at irregular intervals, and perhaps more frequently since
the use of Mesaba ores, their frequency depending upon the
manner in which the furnace is working.   Sometimes there
may be but four ' slips' in twenty-four hours, while at other
times during the same period the number may be as high as
eighteen."

The seventeenth finding is : " Ore dust was first noticed
settling upon properties in the neighborhood of defendant's
furnaces as early as 1899, but the deposit did not become
serious until about July, 1901.   Since that time, dust, in
greater or less quantities, has been carried from the defend-
ant's furnaces and deposited upon and about plaintiffs' prem-
ises.   The effect of the dust is not only annoying, but inju-
rious to property ; it chokes rain conductors upon the houses,
discolors fabrics and paints, and injures carpets and curtains ;
it is of a greasy nature and difficult to remove from both gar-
ments and paints ; it has also been destructive to fruit and
shade trees and vegetation generally, and has depreciated the
value of plaintiffs' properties from twenty-five per cent to
fifty per cent."   The furnaces were operated in a careful and
skillful manner, and no effort or money was spared to keep
them in constant good order and repair.   As to the escape of
this ore dust, a further finding is the sixteenth :   " The escape
of ore dust due to ' slips' in the furnace is a financial loss to
the operator, both in the matter of production and in the loss
of ore ; the defendant has been diligent in its efforts to find
means, or to adopt appliances or inventions which will prevent
the escape of dust from its furnaces ; up to the present time
no appliance has been found which will effectually prevent,
or reasonably diminish, the escape of the ore dust from blast
furnaces, when ' slips' occur.   The use of Old Range ores ex-
clusively would not materially lessen the number of ' slips'
occurring in furnaces, but would to a considerable extent de-

crease the amount of ore dust discharged into the air at each explosion."

Answering requests for findings of fact by the appellants, the court said that, in its own findings, it had substantially found the following : " The residence district in which plaintiffs' property is situated, and which is a part of the Fourteenth ward of the city of Pittsburg, was, prior to the year 1899, a pleasant and habitable part of the city. While subject, as most parts of the city are, to smoke, it occasioned no special inconvenience to the inhabitants and the testimony shows that flowers, trees, and shrubs were kept and cared for, and were not injured by any smoke or dust which might prevail throughout the district. Some of the witnesses for the plaintiffs testify that they first noticed the ore dust as early as 1899, but it did not become serious until the year 1901. In the latter year, when all four furnaces were completed and in operation, the ore dust was thrown out in large quantities and at more frequent intervals and has increased from that time down until the filing of the bill. The plaintiffs' property by reason of its location near the defendant's furnaces, receives the full effect of the discharge of ore dust therefrom. Almost all the trees in the orchard which formerly produced some eighty bushels of pears in a season, the shade trees, of which there were something over twenty in number, and the shrubbery about the house have been for the most part destroyed. The whole property has been blackened and disfigured. A number of tenants have been forced to leave the dwelling houses by reason of the penetrating and damaging deposits of ore dust. From the conductors leading from the porch roofs in front of these houses the plaintiffs had removed on one occasion three barrels full of ore dust, the weight of the amount thus removed being some 1,200 pounds." The facts set forth in appellants' fifteenth request, which was not refused, but affirmed; to the extent that the facts had been found in the court's own seventeenth finding, were supported by testimony that was not contradicted. These facts, as set forth in that request, were: " The effect of the ore dust upon properties upon which it is deposited is very damaging. It corrodes tin and metal work which are exposed to it, it chokes and fills conductors, it discolors and removes paint, it affects injuriously

fabrics in the interiors of houses both by impregnating them with dust and by attacking and injuriously affecting the fibre. People are compelled to keep their doors and windows closed during the passing of a dust shower, and even with these precautions, the ore dust sifts in through the crevices to such an extent that it is easily traceable upon window sills, floors, books, furniture and carpets. The ore dust frequently descends in such large quantities that persons caught in it are compelled, in some instances, to hoist umbrellas and seek refuge on porches and in houses. Their clothing is sometimes stained and otherwise injured. It is of a greasy nature, and any garment or surface affected by it is difficult to cleanse." We have, on this appeal, on the foregoing facts, the single question of the appellants' right to some equitable relief.

The appellants are not complaining because appellee is operating its furnaces. They would not be heard if that were their only complaint. The city of Pittsburg is a busy manufacturing center, and by day and by night clouds of smoke ascend from the stacks of its numberless mills, factories and furnaces, ofttimes hanging over it like a pall. In a manufacturing district of this city the appellee has established its furnaces and is engaged in an important and lawful business. The appellants, in a residential portion of the same city, close by this manufacturing district, own houses in which their tenants live. So situated, they must expect a measure of annoyance and discomfort, arising from the dust and smoke, which cannot be avoided in their manufacturing metropolis, and are borne to the homes of the city and fill the air that is breathed. To this general annoyance and discomfort appellants submitted for years without complaint, and they were bound to do so, for they chose to erect their houses not only in sight of great manufacturing plants, but within certain reach of the smoke and dust, without which the fires of the furnaces and factories could not burn. Of all this there is now no complaint by them. What, in common with all other citizens, they had endured for years, up to the summer of 1901, they were willing to continue to endure; and they are not now complaining of appellee's manufacture of iron, even with " Mesaba " ore. Their complaint is that the appellee, in tearing down the three furnaces and replacing them with the four new ones, of immense size and sev-

eral times the capacity of the old, and in using in them the fine "Mesaba" ore dust, without so operating them as to prevent the escape of the dust from "slips," causing admitted devastation, is practically confiscating their properties. To preserve these to them, and to protect them in their absolute right to the enjoyment of their private property, subject to the general conditions of the city in which they live, this bill was filed; and its prayer is not to restrain the appellee from operating its furnaces, and manufacturing iron, but is to enjoin it from such operation of them as causes the serious and exceptional injuries alleged in the bill and proved by the testimony.

As already stated, the facts here are not in dispute. Not a single finding of fact by the learned judge below is assigned as error by the appellants, whose bill he dismissed. Equitable relief cannot, therefore, be withheld because more light as to any alleged fact could be obtained from a jury on the common-law side of the court. It must be granted or refused under practically admitted conditions. If, under these conditions, the appellants are unlawfully injured by appellee, as the damage done is of a serious character not to be measured by ordinary standards, and is immediate and continuing, an attempt to remedy the wrong by a multiplicity of suits would soon make the remedy worse than the wrong itself. [If an injury be continuous and remediable at law only by a multiplicity of suits, it can well be regarded as an irreparable one, calling for the interference of equity by the exercise of its restraining powers] Scheetz's Appeal, 35 Pa. 88; Pennsylvania Lead Company's Appeal, 96 Pa. 116; Bitting's Appeal, 105 Pa. 517; Evans v. Reading Chemical Fertilizing Company, 160 Pa. 209. "By the 13th section of the act of the 16th of June, 1836, made general as to the courts of common pleas throughout the commonwealth by the Act of the 14th of February, 1857, P. L. 39, it was enacted that 'The Supreme Court when sitting in banc in the city of Philadelphia, and the court of common pleas of the said city and county shall have the power and jurisdiction of courts of chancery so far as relates, . . . . to the prevention or restraint of the commission or continuance of acts contrary to law and prejudicial to the interests of the community or the rights of individuals.' Under this section it has been repeatedly and uniformly held that injunction is the appropriate remedy for

the prevention of trespasses and nuisances, which, by reason of the persistency with which they are repeated, threaten to become of a permanent nature. . . . It is the appropriate remedy for such torts because they are within the letter and the spirit of the statute, and it is no objection that the injured party may have a remedy at law. [In such cases the legal remedy may be and usually is wholly inadequate. The damages are frequently difficult of computation, and where they may be readily assessed it will often happen that the expense of a recovery will exceed the amount recoverable for any one of the successive trespasses. It was therefore a wise provision of the legislature that enabled the courts to put an end by a single decree to such controversies as are presented in this record, and the jurisdiction ought not to be abdicated. From this it is not to be inferred, however, that injunction is the appropriate remedy for a single trespass, or for any number of trespasses in the absence of a threat either express or inferable from the manner of their commission that they will be repeated." Walters v. McElroy, 151 Pa. 549.

While the right of the appellee to locate and operate its furnaces in a manufacturing district of the city of Pittsburg must be conceded, there is a right in the appellants entitled to no less recognition and protection by the law, and that is the one they have exercised, of erecting houses on their lands in a residential portion of the same city. Their right is not only to erect these houses, but to enjoy the use of them and the land surrounding them, subject, of course, to the smoky and dusty conditions that ordinarily and constantly come from the mills and furnaces skirting both sides of the Monongahela river. Of this they neither do nor can complain to a chancellor. " The people who live in such a city or within its sphere of usefulness do so of choice, and they voluntarily subject themselves to its peculiarities and its discomforts, for the greater benefit they think they derive from their residence or their business there." Huckenstine's Appeal, 70 Pa. 102.

If this bill were for relief from personal inconvenience and interference with the appellants' full and free enjoyment of their property, due merely to the conditions of smoke and dust that have existed for years and will exist as long as the city itself continues to be the great steel and iron manufacturing

center, it would be promptly dismissed. Of the smoke and dust now coming from all the other surrounding mills and furnaces no complaint is made, and of what used to come from the old furnaces of the appellee the appellants made no complaint, and would not be complaining now but for the changed conditions brought about by the appellee. The court below, though requested by it, refused to find that " the matters complained of by plaintiffs are only such discomforts and inconveniences as are and always have been incident to and consequent upon close proximity to an exclusively manufacturing section of a manufacturing city."

The changed conditions brought about by the appellee have not resulted from the development and natural use and enjoyment of its own property] as was the situation in Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126, the doctrine of which case has never been and never ought to be extended beyond the limitations put upon it by its own facts. There it was said of the coal company: " They have brought nothing on to the land artificially. The water as it is poured into Meadow Brook, is the water which the mine naturally discharges ; its impurity arises from natural, not artificial causes. The mine cannot, of course, be operated elsewhere than where the coal is naturally found, and the discharge is a necessary incident to the mining of it." Here the furnaces were artificially brought by appellee on to its lands by being built there by it, and the " Mesaba " ore converted by the furnaces into iron is also artificially brought there by it. It knew, when about to erect these new furnaces, of immense size and great capacity, that, in their operation, the rights of others, among them those of the appellants, to the use and enjoyment of their property, situated in what, for years, had been a portion of the city given up to residences, were not to be utterly disregarded; and, when it began to use the fine ore dust, which has manifestly caused the serious injury to the property of the appellants, it was again bound to consider the effect of the use of this ore upon the nearby residences. By this we are not to be understood as saying, or even intimating, that the large furnaces could not be erected and operated, that " Mesaba " ore cannot be used, or that if, in the operation of the furnaces and the use of this fine ore, the discomfort and annoyance of the appellants had simply been increased in de-

gree, they would be entitled to equitable relief. When, however, as the result of the improvements voluntarily made by the appellee, and its use of a new ore, the annoyance, inconvenience and injury to which the appellants are now subjected do not differ merely in degree from those to which they formerly submitted as part of their lot as citizens of the " Iron City," but in kind, and practical destruction and confiscation of their properties confront them, a very different situation is presented to a chancellor from those cases in which the rule is laid down that people who live in such a city, or within its sphere of usefulness, do so of choice, and, therefore, voluntarily submit themselves to its peculiarities and its discomforts. That very rule, as announced in Huckenstine's Appeal, supra, recognizes their right to live and have their homes there; and a case cannot be found as authority for the right of any manufacturing company, located in a manufacturing district of a city, to so rebuild and operate its furnaces as to actually destroy homes and other property in a residential portion of the same city. That this is what the appellee is doing with the properties of the appellants is an irresistible conclusion, and the only relief is by injunction. If it is to be permitted to so operate its furnaces that the burning and corroding ore dust emitted from their stacks is borne by the winds and scattered over the properties of the appellants with destroying effect, simply because of the plea that it cannot be helped, for the same reason it might ask a chancellor to stay his arm from arresting the descent of showers of fire from the same stacks down on the same nearby homes. If the appellee possessed the right of eminent domain, it might take the properties of the appellants and do with them what it pleases, but, not having such high right, it cannot do so, even indirectly. It has a right to the use and enjoyment of its own property, but so have the appellants to theirs, for whom the law says to the former " sic utere tuo, ut alienum non laedas."

The court below found that " the use of Mesaba ores in the manufacture of pig iron seems at present to be a necessity." At the same time it refused to find, as requested by the defendant, that " it is to-day a practical and commercial impossibility for manufacturers of iron and steel to obtain a supply of ores for their blast furnaces other than by the use of Mesaba ores." There was a finding, " That appliances have been sug-

gested for the purpose of diminishing or preventing the dissemination of ore dust from furnaces. These appliances, however, have not been generally adopted by operators. The defendant company, however, has recently entered into a contract with the patentee of one of these appliances known as the Keelin Top, for the placing upon, at least one of their furnaces of that design. It has also entered into a contract for the construction at its furnaces of a plant for the briquetting of Mesaba ore, with the end in view of preventing 'slips,' and thereby avoiding the escaping of dust into the atmosphere. The success of these devices is not assured, they being, to a great extent, matters of experiment." It is, therefore, by no means certain that the appellee will not be able to obviate, as is its duty, the continuance of the great injury done to the appellants, either by substituting another ore for the " Mesaba " or by adopting appliances that will prevent the escape of dust from " slips."

⌐In dismissing the plaintiff's bill the learned judge stated that he knew of no case in which the identical question here involved had been passed upon by the courts.⌐ He relied, however, as bearing upon it, on Richards's Appeal, 57 Pa. 105 ; Huckenstine's Appeal, 70 Pa. 102 ; Dilworth's Appeal, 91 Pa. 247 ; Robb v. Carnegie, 145 Pa. 324 ; and Daugherty Typewriter Co. v. Kittanning Iron & Steel Mfg. Co., 178 Pa. 215. The unquestionable general principles recognized in these cases were applicable to the facts in each. An injunction was refused in the first, THOMPSON, C. J., saying: " On full consideration of all the testimony in the case, we are of opinion the injunction was properly refused in the court below." The testimony showed that the smoke and soot were carried to, over and into the dwelling and factory of the plaintiff ; if the door and windows were open, the soot sometimes settled on the furniture of the house and on the machinery and goods in the factory. It was only when the wind blew from a particular point, and when the atmosphere was in a particular state, that the smoke and soot were carried to the plaintiff's buildings. They were annoying to the occupants of the plaintiff's house and the operatives of his factory, and, to a slight extent, injurious to those buildings. There was no evidence of any injury to the goods manufactured or to the health of the family or operatives. In Huckenstine's Appeal, in refusing the

injunction, it was said: " The gravamen of the plaintiff's bill is that the smoke and gases from the defendant's kiln injured and partially destroyed his grapevines and fruit trees, and make his dwelling uncomfortable. In regard to the injury to the vines and trees, which is the chief ground of complaint, the plaintiff's case is doubtful on two grounds. In the first place, his testimony as to the injury from the causes stated is counterpoised if not outweighed by the testimony of the defendant both in the number and skillfulness of the witnesses. And in the second place it is rendered more than doubtful by the testimony of the defense that the true cause of the blight in the vines is the nature, and cold and wet condition of the soil. The force of the rebutting evidence that the hillside is dry, and for the reason that water will not lie on a slope, is broken by the consideration known to every common observer that water following the lines of stratification will exude from hillsides, oftentimes in large quantities and the whole year round. To entitle a plaintiff to an injunction he must make out a plain case of injury and damage. ' If the injury be doubtful, eventual or contingent, equity will not interfere by injunction.' " In both these cases the injury, if any, was comparatively slight. In Dilworth's Appeal, which was a bill to restrain the erection of a powder magazine, the facts, as stated in the opinion of the court, were: " This magazine has been located so as to endanger as few persons and as little property as possible, and yet be reasonably accessible as a point of supply and distribution; it is more remote from population than the magazines generally in use throughout the United States, and it is doubtful if a better location could be made in Allegheny county. It is situated about two miles from East Liberty, the nearest closely built up district, and is separated therefrom by intervening hills and ravines. It is in a sparsely settled locality, for the vicinity of a city, and land near it has not been, nor is it likely to be for some years, in demand for building purposes. That portion of Lincoln avenue which terminates at a point five hundred feet from the magazine is very little travelled, very few people travel it within considerable distance of its terminus, having no occasion to do so; it was the wildest of the many absurd enterprises undertaken in Pittsburgh to carry city improvements into wild rural regions,

expecting population to rapidly follow. The other public road, passing within 22 feet of the magazine, has for some time been almost abandoned by the people of the vicinity, and is used by about three farmers. The magazine is so situated that the force of an explosion would be down the ravine and away from the road." In Robb v. Carnegie whatever was said by WIL-LIAMS, J., as to an injunction was purely obiter dictum. The question of equitable relief was not before the court. What was decided, was, that the plaintiff was entitled to recover on the common-law side of the court, and, in making the passing remark that the evidence in the case would not justify an injunction, it was said : " It shows a selection of a site as well adapted to the business, and as remote from dwellings as any in that region. To enjoin the manufacture of coke, at such a site, would amount to a prohibition of its manufacture, and the destruction of vast allied and dependent industries of immense value to the public as well as to those directly engaged in them." And it was further said : " But the production of iron, or steel, or glass, or coke, while of great public importance, stands on no different ground from any other branch of manufacturing, or from the cultivation of agricultural products. They are needed for use and consumption by the public, but they are the results of private enterprise, conducted for private profit and under the absolute control of the producer. He may increase his business at will, or diminish it. He may transfer it to another person, or place, or state, or abandon it. He may sell to whom he pleases, at such price as he pleases, or he may hoard his productions, and refuse to sell to any person or at any price. He is serving himself in his own way, and has no right to claim exemption from the natural consequences of his own act. The interests in conflict in this case are, therefore, not those of the public and of an individual, but those of two private owners who stand on equal ground as engaged in their own private business." In Daugherty Co. v. Kittanning Mfg. Co., the question before this court was the refusal of the court below to award a preliminary injunction, and all we did was to remit the case, saying : " It is neither necessary nor proper that we should now intimate any opinion as to the merits of the case generally. It goes back for further proceedings—possibly for final hearing on bill, answer

and full proofs.    A materially different state of facts may then be presented.  · We therefore adhere to our general rule in appeals from interlocutory decrees, and merely hold that, as presented to the court below, this case is not one that would have justified a preliminary injunction."    It needs no further demonstration from us to point out the difference between the facts in the first four foregoing cases and the undisputed ones in the present.    The fifth has no application whatever.

It is urged that as an injunction is a matter of grace, and not of right, and more injury will result in awarding than refusing it, it ought not to go out in this case. [A chancellor does act as of grace, but that grace sometimes becomes a matter of right to the suitor in his court, and, when it is clear that the law cannot give protection and relief—to which the complainant in equity is admittedly entitled—the chancellor can no more withhold his grace than the law can deny protection and relief, if able to give them.] This is too often overlooked when it is said that in equity a decree is of grace, and not of right, as a judgment at law.    In Walters v. McElroy et al., supra, the defendants gave as one of the reasons why the plaintiff's bill should be dismissed, that his land was worth but little, while they were engaged in a great mining industry which would be paralyzed if they should be enjoined from a continuance of the acts complained of ; and the principle was invoked, that, as a decree in equity is of grace, a chancellor will never enjoin an act where, by so doing, greater injury will result than from a refusal to enjoin.    To this we said : " The phrase ' of grace ' predicated of a decree in equity had its origin in an age when kings dispensed their royal favors by the hands of their chancellors, but, although it continues to be repeated occasionally, it has no rightful place in the jurisprudence of a free commonwealth, and ought to be relegated to the age in which it was appropriate.    It has been somewhere said that equity has its laws as law has its equity.    This is but another form of saying that equitable remedies are administered in accordance with rules as certain as human wisdom can devise, leaving their application only in doubtful cases to the discretion, not the unmerited favor or grace of the chancellor.    Certainly no chancellor in any English speaking country will at this day admit that he dispenses favors or refuses rightful de-

mands, or deny that when a suitor has brought his cause clearly within the rules of equity jurisprudence, the relief he asks is demandable ex debito justitiæ, and needs not to be implored ex gratia.   And as to the principle invoked, that a·chancellor will refuse to enjoin when greater injury will result from granting than from refusing an injunction, it is enough to observe that it has no application where the act complained of is in itself as well as in its incidents tortious.   In such case it cannot be said that injury would result from an injunction, for no man can complain that he is injured by being prevented from doing to the hurt of another that which he has no right to do.   Nor can it make the slightest difference that the plaintiff's property is of insignificant value to him as compared with the advantages that would accrue to the defendants from its occupation."

There can be no balancing of conveniences when such balancing involves the preservation of an established right, though possessed by a peasant only to a cottage as his home, and which will be extinguished if relief is not granted against one who would destroy it in artificially using his own land.   Though it is said a chancellor will consider whether he would not do a greater injury by enjoining than would result from refusing and leaving the party to his redress at the hands of a court and jury, and if, in conscience, the former should appear he will refuse to enjoin : Richards's Appeal, supra ; that " it often becomes a grave question whether so great an injury would not be done to the community by enjoining the business, that the complaining party should be left to his remedy at law : " Dilworth's Appeal, supra ; and similar expressions are to be found in other cases, " none of them, nor all of them, can be authority for the proposition that equity, a case for its cognizance being otherwise made out, will refuse to protect a man in the possession and enjoyment of his property because that right is less valuable to him than the power to destroy it may be to his neighbor or to the public : " Evans v. Reading Chemical Fertilizing Co., 160 Pa. 209.   The right of a man to use and enjoy his property is as supreme as his neighbor's and no artificial use of it by either can be permitted to destroy that of the other. To this rule if at times there are apparently some exceptions, the present case is not one of them.

The decree of the court below is reversed, the bill is rein-

stated and the record remitted, with direction that an injunction be issued perpetually enjoining Jones & Laughlin Steel Company, the appellee, from such operation of its furnaces, situated in the Fourteenth ward of the city of Pittsburg, and described in the bill, as to cause to be emitted therefrom clouds of ore dust, working and causing the injury to the property of the appellants as in the bill described and found by the court below, the costs on this appeal and in the proceedings below to be paid by the appellee.

MR. CHIEF JUSTICE MITCHELL dissenting :

It is conceded that when the respondents located their works they were in an appropriate place. Certainly the complainants cannot deny this for they sold the land for this express purpose. The establishment of the works carried with it the right to future change and expansion not only as to extent but as to methods in the progress of the business. It was accompanied at all times by some inconvenience to residents of the neighborhood, and I am unable to concur in the views of the majority that the change by the introduction of the use of Mesaba ore was a change in the kind of injury. On the contrary I am of opinion that it was one of degree only, but whether that be the correct view or not the question is one of fact which is by no means clear and therefore should go in the first instance to a court of law to be settled by a jury. Where a clear legal right is being infringed I agree that the remedy in equity is as mandatory as in law, but where as here the question is between two conflicting rights, their respective claims should be ascertained at law before equity is called upon to aid either. I would therefore affirm the decree.

MR. JUSTICE FELL :

I concur in the views expressed by the Chief Justice.

MR. JUSTICE THOMPSON dissenting :

The principle which impels a chancellor to act in that mass of cases where his action will avoid a multiplicity of recoveries at law or will stop injuries so repeated in character as likely to become excessively burdensome seems a logical result of the necessity of an equitable jurisdiction to avoid oppres-

sive litigation and irreparable mischief and in the exercise of
it there is necessarily the element of a discretion based upon
sound principles.   The decrees made by virtue of it are often
described as " matters of grace," a substantive thing not to be
refined into a meaningless phrase, and accordingly our judicial
literature furnishes an important class of litigation in which
they are so designated.

In Keeling v. Pittsburg, etc., Railroad Company, 205 Pa. 31,
Mr. Justice DEAN, quoting, says : " An injunction is of grace
and not of right and a chancellor is not bound to make a de-
cree which will do far more mischief and work far greater
injury than the wrong he is asked to redress."

In Robb v. Carnegie, 145 Pa. 324, Mr. Justice WILLIAMS
says : " An injunction is not of right but of grace, and will
never be issued by a court of equity when it will inflict a
greater injury than it will prevent."

In Huckenstine's Appeal, 70 Pa. 102, Mr. Justice AGNEW
says : " Its (a court of equity) aid is not of right but of grace
and it must be sure that the exercise of this kingly power is
just, wise and proper, before it takes from the citizen his
means of livelihood, and destroys the value of his property
for legitimate uses."

In Richards's Appeal, 57 Pa. 105, Mr. Chief Justice THOMP-
SON says : " It seems to be supposed that, as at law, whenever
a case is made out of wrongful acts on the one side and
consequent injury on the other, a decree to restrain the act
complained of must certainly follow, as a judgment would
follow a verdict in a common-law court.  This is a mistake.  It
is elementary law, that in equity a decree is never of right,
as a judgment of law is, but of grace."

As a decree in equity is a matter of grace a chancellor will
not make it where it will produce a greater injury than it will
prevent, and because it is a matter of grace will balance the
inconveniences that may be caused either by granting or refus-
ing it.   This principle is well illustrated in Richards's Appeal,
supra.   In that case the plaintiff, a manufacturer, sought to re-
strain the defendant company from operating a furnace for
smelting iron because in their furnaces they used semi-bitumi-
nous coal and that dense masses of smoke and soot were emitted
from them filling his house and factory with sulphurous, un-

wholesome and noxious smoke, injuring the furniture and causing discomfort as well as unhealthiness. The defense was that for a period of thirty years or more bituminous coal had been used and that semi-bituminous coal was subsequently used and that the smoke was but slightly sulphurous and while it was disagreeable it was not unwholesome; that semi-bituminous coal was necessary in order to make superior bar iron; that to purchase plaintiff's whole property would cause them less loss than the injury consequent upon stoppage; that they employed in their business a capital of $500,000 and more than 1,000 persons. Mr. Chief Justice THOMPSON in delivering the opinion of the court in that case says:

" A careful consideration of the testimony satisfies us that the use of semi-bituminous coal, the fuel complained of, is necessary to the successful manufacture of iron fit for axles, cannon and the like, in the manufacture of which the defendants are largely engaged; that the process of manufacture and fuel used, are generally employed in similar establishments, and that there was neither a negligent nor wilful infliction of injury upon the plaintiff or his property in the defendants' mode of operating their works. Whatever of injury may have, or shall result to his property from the defendants' works by reason of the nuisance complained of, is such only as is incident to a lawful business conducted in the ordinary way, and by no unusual means. Still there may be injury to the plaintiff; but this of itself may not entitle him to the remedy he seeks. It may not if ever so clearly established, be a case in which equity ought to enjoin the defendants in the use of a material necessary to the successful production of an article of such prime necessity as good iron; especially if it be very certain that a greater injury would ensue by enjoining, than would result from a refusal to enjoin."

In Huckenstine's Appeal, supra, a bill was filed to restrain the conduct of a brickmaking business in which there was evolved smoke, vapor and gases destructive of plaintiff's vineyard, orchard and trees, and Mr. Justice AGNEW in dismissing the bill and remitting plaintiff to his action at law says: " It (brick burning) as many other useful employments do, may produce some discomfort, and even some injury to those nearby. But it does not follow that a chancellor would enjoin therefor.

The heat, smoke and vapor of a brick kiln, cannot compare with those of many manufactories carried on in the very heart of such cities as Pittsburg and Allegheny. A court exercising the power of a chancellor, whose arm may fall with crushing force upon the everyday business of men, destroying lawful means of support, and diverting property from legitimate uses, uses cannot approach such cases as this with too much caution."

Again, he says: " In the present case the kiln of defendant is situated on an outskirt of the city of Allegheny. The properties of the plaintiff and defendant lie adjoining each other, on the hillside overlooking the city, whose everyday cloud of smoke from thousands of chimneys and stacks hangs like a pall over it obscuring it from sight. This single word describes the characteristics of this city, its kind of fuel, its business, the habits of its people and the industries which give it prosperity and wealth. The people who live in such a city or within its sphere of influence do so of choice, and they voluntarily subject themselves to its peculiarities and its discomforts, for the greater benefit they think they derive from their residence or their business there."

These cases clearly confirm the principle that a chancellor will consider whether he would not do a greater injury by enjoining than would result in refusing to enjoin and leaving the party to his redress at the hands of a court and jury.

While Robb v. Carnegie, 145 Pa. 324, was an action at law to recover damages for injuries to land in the operation of a coke furnace, Mr. Justice WILLIAMS says:

" We think it is true as held by the judge of the court below, that the evidence in this case would not justify an injunction. It shows a selection of a site as well adapted to the business, and as remote from dwellings as any in that region. To enjoin the manufacture of coke, at such a site, would amount to a prohibition of its manufacture, and the destruction of vast allied and dependent industries of immense value to the public as well as to those directly engaged in them."

Again he says: " It is a fundamental principle of our system of government that the interest of the public is higher than that of the individual; so that when those interests are in conflict the latter must give way. If the individual is thereby

deprived of his property without fault on his part, he is entitled
to compensation; but if he is affected only in his tastes, his
personal comfort or pleasure, or preferences, these he must sur-
render for the comfort and preferences of the many. Thus
highways are necessary to the public business and comfort.
Some noise and dust are necessarily occasioned by the legiti-
mate use of them. This may be disagreeable, perhaps in some
cases positively harmful, to some one or more of the persons
living along them; but for this there is no remedy at law or
equity. It is one of the necessary consequences of subjecting
the individual to the public, as to those things in which their
interests are in conflict."

In Wier's Appeal, 74 Pa. 230, Mr. Justice SHARSWOOD says:
"There is a very marked distinction to be observed in reason
and equity between the case of a business long established in
a particular locality, which has become a nuisance from the
growth of population and the erection of dwellings in proxim-
ity to it, and that of a new erection threatened in such
vicinity."

It doubtless may be contended that the principle of balanc-
ing inconveniences cannot be made the means of a successful
assault upon the strong wall built around the right of property
which secures it from invasion and not infrequently eloquent
phrase finds utterance in vindication of an established right
of property from the invasion which may spring from numer-
ous actions or the repetition of injuries. The fact of a possible
series of actions or of repeated injuries does not necessarily
negative an adequate remedy at law. There is a class of cases
where the injury is of a continuing and permanent character
and the damages are entire and susceptible of immediate re-
covery. Central Branch Union Pacific Railroad Co. v. An-
drews, 26 Kansas, 702; Fowle v. New Haven & Northampton
Co., 112 Mass. 334; C. & E. I. R. R. Co. v. Loeb, 118 Ill. 203;
Stodghill v. R. R. Co., 53 Iowa, 341. Also see Gavigan v.
Atlantic Refining Company, 42 W. N. C. 465. It does not
follow that merely a possible recurrence of suits or of injuries
will necessarily induce a chancellor to act. The energy of the
equitable principle may well be aroused when beyond question
the actions become so repeated and the injuries so continuous,
resulting in irreparable mischief, that the vanity of the adequacy

of the remedy at law is clearly manifest and then the equitable principle may be asserted because necessary for protection. While the facts of the present case do not furnish a case for the exercise of a jurisdiction founded upon such necessity, they however do establish one for the application of the principle of Richards's Appeal and the kindred cases, supra. They are that the furnaces of the appellee company have been operated by it and its predecessors since 1860, on the present site and on the land purchased from Mrs. Sullivan, one of the appellants; that the iron and steel industries of the appellee have been operated by it for nearly fifty years on their present site; that there is a bluff 150 feet above Second avenue and that appellant's properties are situate on this bluff and about 1,000 feet from the blast furnaces the stacks of which are a little. above the level of the top of the bluff. That the district in which these mills are located is and has been for many years distinctively and exclusively a manufacturing district well suited and appropriate for manufacturing purposes extending for several miles above and below the appellee company's furnaces and mills. That the district at the top of the bluff where appellants' properties are located is a residential locality and has been subject more or less to annoyance from smoke and dust arising from the furnaces below.

That the blast furnaces of the appellee company represent a cash investment of $5,000,000 and in them and incidental thereto are imployed 10,800 persons, who are paid in wages monthly, $500,000. That between March, 1898, and May, 1901, the three Eliza furnaces were improved, enlarged and rebuilt in accordance with modern and improved plans and equipped with modern and improved appliances and improvements; that they are the largest known in the iron business with a producing capacity of 500 tons daily, and a daily consumption of 4,000 tons of ore. That consequent upon " slips " occasioned by encrusting ore in the stack of the furnace, dust always escapes from blast furnaces. That on the top of each of the furnaces are explosion or expansion doors for the purpose of permitting the generated gas to pass into the open air; that the dust complained of is carried by the wind upon the properties of the appellants, the amount depending upon the force of the wind and the ex-

plosion. That in the manufacture of pig iron the iron ores used are known as " Old Range " and " Mesaba " ores, the former being comparatively free from dust. That the Old Range ores are almost exhausted, the output not being sufficient to permit of the exclusive use of the same in the manufacture of pig iron and in a short time none will be in the market. That the mines which control these ores are practically controlled by one company, a competitor of appellee company, and their cost is seventy-five cents per ton more than the Mesaba ores ; that the latter ores have been used in all furnaces of the district in making pig iron since 1892, upon which date to 1902 the amount of the same shipped to lake ports has increased from 5,000 tons to 12,000,000 tons in 1902. That for seven or eight years appellee company has used in its furnaces thirty per cent of these ores, which is less than was generally used in the blast furnaces in the same district and at the present time uses about twenty-three per cent. That the appellee company has been diligent in its efforts to find means and adopt appliances and inventions which will prevent the escape of dust from its furnaces and that up to the present time no appliance has been found that will effectually prevent or reasonably diminish the escape of the ore dust from the blast furnaces when slips occur. That while there was a deposit of dust the same only became serious about July, 1901, and since then the dust has been coming largely upon appellants' property. That its effects are not only annoying but injurious ; that it chokes rain conductors, discolors fabrics and paints, and injures carpets and curtains ; that it is destructive of fruit and shade trees and has depreciated the value of the properties of the appellants to the extent of twenty-five or fifty per cent.

Thus upon the one side is a business started many years ago which has been steadily developing until it has reached a very great magnitude. With its increase its appliances have been improved and its blast furnaces enlarged and these have been the natural growth of its business. It has managed its business with a due regard as far as practicable for those who lived near the district within which its blast furnaces were located. It has been diligent in the effort to obtain appliances and inventions designed to avoid as much as possible any annoyance

that might arise from smoke, dust or gases. With the Old Range ores, because of their coarseness the dust and gases were thrown out on the recurrence of slips, but with the Mesaba ores the dust and gases thrown out have been increased very largely, but not to an extent to be necessarily a nuisance per se. The supply of the Old Range ores has been gradually approaching exhaustion and is practically controlled by a competitive concern and the requirements of the business compel appellees to use Mesaba ores and the amount used is about twenty-three per cent. Its use is clearly legitimate in the conduct of its large business. The necessity for the use of such ores becomes apparent upon a consideration of the enormous growth of their use, from 5,000 tons at one period to 12,000,000 tons within a comparatively short period.

The facts show that the inability of the appellee to use such ores would practically operate as a prohibition of its business and thus upon the one side a decree restraining appellee from such use would so impair its capacity to do business that it would produce disaster affecting a large manufacturing interest involving the welfare of an army of employees and be productive of irreparable damage. Upon the other side the damage that would arise from the continuance of that business by a refusal to make a decree would be that the rain conductors upon appellants' houses might still be choked somewhat and their fabrics and paints discolored and their carpets and curtains injured. That they still might have some difficulty in removing the grease stains from their garments and paints and their shade trees and fruit trees, if such be of value amid the smoke of Pittsburg might be destroyed and their property might be depreciated from twenty-five to fifty per cent of its value. Such latter damage, however, being directly to the property itself is clearly ascertainable and cannot well be classed as irreparable.

The facts thus marshalled present an accumulation of injurious irreparable results likely to occur from a decree against appellee that should in view of those capable of reparation that might occur to appellants, constrain a chancellor to refuse to make it. While a judge has no right to be influenced in the determination of a case merely because of the effect of a decision, yet when it is a matter of grace, guided by sound

discretion, he may well in the exercise of such discretion, wisely consider some of the consequences that may result from his action and manifestly so when a manufacturing district on the one side and a residential locality on the other are involved and the learned trial judge very significantly says :

" While the extent of the injury resulting to plaintiffs from the dust can be ascertained, the injury resulting to defendants by a decree cannot be estimated. Such a decree would practically mean the shutting down of not only its furnaces, but also its iron and steel works, representing together a capital of at least $60,000,000, and the employment of nearly 11,000 persons. The effect of a restraining order will not be confined to the defendant company, because, if it is unlawful for defendant company to use Mesaba ores it is also unlawful for every other furnace in this county to use those ores ; an injunction therefore in this case would affect injuriously every one of the thirty-seven blast furnaces in Allegheny county, and their allied industries, with capital as shown by the industrial statistics of the commonwealth, aggregating $400,000,000 and employing 60,000 persons. As there are not sufficient " Old Range " ores mined to supply the demand if the exclusive use of these ores be required, a decree which makes the use of Mesaba ores impossible means the shutting down of every blast furnace in the county within a year, as the supply of " Old Range " ores will be exhausted within that time. What that would mean to the people of this city and county needs no discussion. The damage would be inestimable."

A decree operative of destructive results so far-reaching and extensive as thus indicated, certainly might well warrant the deduction that in it there was not a suspicion of that " matter of grace " held to be an element in the determination of a chancellor in cases of this character. Pittsburg is a monument to the progress and activity of the manufacturing interests and her achievements in that direction have made her one of our most conspicuous cities. Judicial restriction that would limit these activities might well be regarded as inimical to her best interests in the direction of progress, and where judicial action is based upon " matter of grace " guided by wise discretion, it should not be unnecessarily narrowed, but should be, to an extent as far as may be practicable and legal, broadened in

a way most wise for the best form of progress and the highest standard of development.

I am of opinion that the decree of the court below dismissing the bill should be affirmed.