From William R. Toal, Media, Pa.

---

## Hansell v. Suburban Enterprises Company.

*Injunction—Preliminary—Upper and lower riparian owners—Swimming pool, bathrooms and toilets — Artificial collection of water — Discharge into ravine.*

1. A preliminary injunction will be granted to restrain an upper riparian owner from discharging the drainage from a swimming pool, bathrooms and toilets into a ravine passing upon and over the lands of plaintiff, a lower riparian owner.

2. An upper riparian owner may not artificially collect water upon his land and thereafter discharge it upon the land of a lower riparian owner.

Bill for injunction to restrain discharge of water on plaintiff's land. C. P. Allegheny Co., July T., 1926, No. 2094, in Equity.

*Frederic W. Miller,* for plaintiff; *Duff, Marshall & Davis,* for defendant.

McVICAR, J.—This case comes before us on a motion for a preliminary injunction. From the evidence taken at the hearing on the motion, it appears that the plaintiff is the owner of a tract of about five acres of land situate in the Township of Penn, Allegheny County, Pennsylvania, which he purchased in the year 1922. The defendant is the owner of an adjoining tract of about the same size, which he purchased in March of 1926. There is a ravine which begins on the defendant's land, runs across the land of the plaintiff and continues from thence a distance of a half mile or more to Sandy Creek. This ravine is a natural watercourse. Water runs in this ravine continuously from a point about 250 feet below the defendant's land to Sandy Creek. Sewage from a dwelling, housing three families, on the plaintiff's lot, after treatment, is discharged into this ravine. Also, during the rainy season, some sewage enters this ravine from land above that of the defendant's property.

Hansell v. Suburban Enterprises Company.

The land of the plaintiff is lower than the land of the defendant. The natural drainage from the defendant's land is into the ravine aforesaid, which ravine has well-defined banks from a point a short distance below the line between the plaintiff's and the defendant's lands.

The defendant, as appears from its certificate of incorporation, recorded in the said Recorder's Office in Charter Book Vol. 59, page 648, was formed "for the purpose of owning, operating and leasing amusement plants, appliances and apparatus, including swimming pools, and, in connection therewith, the buying, owning, selling, letting and leasing of cottages."

Since the purchase by defendant of its land aforesaid, it has constructed a large swimming pool upon its land, and proposes to construct bathrooms and toilets, for the purpose of entertaining the public. The swimming pool will contain, when used, about 380,000 gallons of water. The drainage from the swimming pool, bathrooms and the toilets is to be conducted in a drain or pipe on the defendant's land to the ravine aforesaid at a point at or about the division-line between the plaintiff's and the defendant's lands; and from thence said drainage will pass over the plaintiff's land. The water which the defendant proposes to use will be purchased from a water company and conducted by pipe-line to the defendant's land. It is proposed to discharge between twelve and thirteen thousand gallons of water each day from the swimming pool, and during the same time about the same amount of new or fresh water will be received.

The sewage from the toilets is to be treated in accordance with a system to be approved by the State Department of Health. It is also proposed to discharge, at least once during the swimming season, which begins in June and ends in September, all the water from the swimming pool during a period of about eight hours. There is no public sewer system in Penn Township, and, in accordance with the evidence, there is no other practical way of taking care of the waste water from the swimming pool, bathrooms and the toilets, except by a discharge into the ravine aforesaid.

This application for a preliminary injunction raises two questions: First, has the defendant a right to discharge the drainage from its swimming pool, bathrooms and toilets into the ravine so that such drainage will pass upon and over the plaintiff's land? Second, if defendant does not have such a right, should it be restrained by a preliminary injunction?

It was conceded at the oral argument that the general rule would preclude an upper riparian owner from artificially collecting water upon his land and thereafter discharge it upon the land of a lower riparian owner. The defendant, however, claimed that there was an exception to this general rule which permitted an upper riparian owner to collect water artificially for use in the conduct of a lawful business and thereafter to discharge the water thus collected on to the land of a lower riparian owner. The defendant claimed that this case came under this exception. The defendant cited in support of its contention the cases: Pfeiffer v. Brown, 165 Pa. 267; Clouse v. Crow, 68 Pa. Superior Ct. 248; Coal Company v. Sanderson, 113 Pa. 126; Sloan v. James, 13 Pa. Superior Ct. 399. But these cases all differ from the instant case. They were cases where the natural flow of water had been changed by the development of some mineral within the land itself.

The reason for the rule in such cases is stated briefly in the case of Coal Company v. Sanderson, supra, at page 145: "It will be observed that the defendants have done nothing to change the character of the water, or to diminish its purity, save what results from the natural use and enjoyment of their own property. They have brought nothing on to the land artificially. The

water as it is poured into Meadow Brook is the water which the mine naturally discharges; its impurity arises from natural, not artificial, causes. The mine cannot, of course, be operated elsewhere than where the coal is naturally found, and the discharge is a necessary incident to the mining of it."

The changed condition which the defendant proposes making does not result from the development and natural use and enjoyment of its own property, but from an artificial use which it proposes to make thereof.

This case is governed by the principle laid down by the Supreme Court in the case of Sullivan v. Jones & Laughlin Steel Co., 208 Pa. 540, known as the "Ore-dust Case," wherein the Supreme Court said (page 549) : "The changed conditions brought about by the appellee have not resulted from the development and natural use and enjoyment of its own property, as was the situation in Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126, the doctrine of which case has never been and never ought to be extended beyond the limitations put upon it by its own facts. There, it was said of the coal company: 'They have brought nothing on to the land artificially. The water as it is poured into Meadow Brook is the water which the mine naturally discharges; its impurity arises from natural, not artificial, causes. The mine cannot, of course, be operated elsewhere than where the coal is naturally found, and the discharge is a necessary incident to the mining of it.' Here, the furnaces were artificially brought by appellee onto its lands by being built there by it, and the 'Mesaba' ore converted by the furnaces into iron is also artificially brought there by it. It knew, when about to erect these new furnaces, of immense size and great capacity, that, in their operation, the rights of others, among them those of the appellants, to the use and enjoyment of their property, situated in what for years had been a portion of the city given up to residences, were not to be utterly disregarded; and, when it began to use the fine ore dust, which has manifestly caused the serious injury to the property of the appellants, it was again bound to consider the effect of the use of this ore upon the nearby residences."

See, also, Woelpper v. Pennsylvania Water Co., 250 Pa. 559.

Should the defendant be restrained by preliminary injunction? It is immaterial that greater injury may result from granting than from refusing an injunction. In Stuart v. Gimbel Bros., 285 Pa. 102, 107, the Supreme Court said: "And as to the principle invoked, that a chancellor will refuse to enjoin when greater injury will result from granting than refusing an injunction, it is enough to observe that it has no application where the act complained of is in itself, as well as in its incidents, tortious. In such case, it cannot be said that injury would result from an injunction, for no man can complain that he is injured by being prevented from doing, to the hurt of another, that which he has no right to do. Nor can it make the slightest difference that the plaintiff's property is insignificant in value to him as compared with the advantages that would accrue to the defendants from its occupation."

A preliminary injunction is properly granted where the right is clear and the injury is irreparable. Both of which conditions exist here. In the case of Stuart v. Gimbel Bros., supra, at pages 108 and 109, the Supreme Court said: "It is, of course, true, as asserted by appellee, that 'a preliminary mandatory injunction is never granted except when the plaintiff's rights are clear and the threatened injury is irreparable,' but that is exactly this case. Plaintiff's rights depend solely on the construction of the deeds in his chain of title, and no doubt exists as to the interpretation of the language in them. 'Irreparable' does not mean that an award in money would not be adequate, if plaintiff's right were to be measured in that way; for paying him the full

value of his property would be at least an adequate recompense, if the courts could properly approve the injury upon defendants making such a payment. No court can rightfully do this, however, for it would result in a *pro tanto* taking of the property for a private use, and this, as we have shown, cannot be done. It was said in Com. *v.* Pittsburgh & Connellsville R. R., 24 Pa. 159, 160, quoted with approval in Phila. Ball Club, Ltd., *v.* Lajoie, 202 Pa. 210, 216, that: 'The argument that there is no 'irreparable damage,' would not be so often used by wrongdoers if they would take the trouble to observe that the word 'irreparable' is a very unhappily chosen one used in expressing the rule that an injunction may issue to prevent wrongs of a repeated and continuing character, or which occasion damages which are estimable only by conjecture and not by any accurate standard. . . . As this argument is generally presented, it seems to be supposed that injunctions can apply only to very great injuries; and it would follow that he who has not much property to be injured cannot have this protection for the little he has. Besides this, where the right invaded is secured by statute or by contract, there is generally no question of the amount of damage, but simply of the right.' As applied in equity, 'irreparable injury' is, in fact, nothing else than the antithesis of 'an adequate remedy at law;' where the latter does not exist (as is the case here), the former does. Clearly it would be 'only by conjecture and not by any accurate standard' that a jury could measure the damages caused by depriving plaintiff of a convenient access to his property, whether for its ordinary uses or for the erection of a building thereon."

The decree of the lower court refusing a preliminary mandatory injunction was reversed and the Supreme Court directed that such an injunction be issued.

The hearing on this application, together with the oral argument, consumed nearly two days of the court's time. Experts were called and fully examined by both sides. The evidence seems to have been fully developed. There was ample opportunity for preparation. The questions of law were fully argued orally and written briefs furnished thereafter. The right of the plaintiff to own and enjoy his land freed from the servitude of receiving the sewage which the defendant proposes to cast thereon is clear. The proposed acts of the defendant, if committed, would be tortious. There seems no good reason why the court should permit the defendant to do that which is unlawful until the final hearing. If the defendant sustains a loss on its investment, it was caused by its own improvidence. Preliminary injunction granted.

Sept. 9, 1926, decree *pro confesso* for default of answer.

From William J. Aiken, Pittsburgh, Pa.