### Commonwealth of Pennsylvania *v.* Barnes & Tucker Company.

Stanley R. Wolfe, Special Assistant Attorney General, with him Philip T. Warman, Special Assistant Attorney General, and J. Shane Creamer, Attorney General, for plaintiff.

Cloyd R. Mellott, with him C. Arthur Wilson, Jr., and Eckert, Seamans, Cherin & Mellott, and Frank A. Sinon, Rhoads, Sinon & Reader, for defendant.

OPINION AND ORDER BY PRESIDENT JUDGE BOWMAN, April 13, 1971:

In this highly technical and controversial case with little legal precedent for the numerous and complex legal issues raised, the sole issue before us at the present time is whether a mandatory preliminary injunction should issue directing the Barnes & Tucker Company to operate what is known as the Duman Dam Treatment Facility pending determination of the case upon its merits.

In late June 1970, there was discovered a substantial discharge of acid mine water into the West Branch of the Susquehanna River from the "Buckwheat" borehole of Lancashire Mine No. 15. The No. 15 mining complex extends from its northeast perimeter on the West Branch of the Susquehanna River to its southwest perimeter at the headwaters of the Allegheny River watershed where the Duman Dam facility is located.

On July 23, 1970, another substantial discharge from No. 15 through the earth's surface into the West Branch in the vicinity and south of the Buckwheat borehole was discovered. This discharge point has become known as the breakout area.

These events precipitated a series of administrative actions by the then Sanitary Water Board with respect to certain outstanding mine drainage permits theretofore issued by the Board to Barnes & Tucker. These permits, and others previously issued, have bearing upon the rights and duties of both Barnes & Tucker and the Commonwealth under the statutory law then in effect and that are presently in force. At this juncture, we shall not further detail or discuss these permits. Suffice it to say here that Barnes & Tucker had constructed at Duman Dam a pumping facility pursuant to one of the permits and briefly operated it prior to cessation of mining activity in No. 15.

The above-mentioned administrative actions by the Sanitary Water Board produced an appeal to this Court by Barnes & Tucker. In the meantime, the Commonwealth had undertaken to treat the discharge into the West Branch from No. 15 by a liming process. This treatment to a large degree prevented *further marked pollution* of the West Branch downstream from the Curwensville Dam and produced a varying but generally favorable level of alkalinity of water in the area of the Curwensville Dam and immediately upstream therefrom; but, by reason of the treatment, large quantities of sludge were precipitated along the banks and on the bottom of the West Branch immediately downstream from the discharge. In a river which theretofore had substantial acid mine drainage pollution (and which continues to be polluted by acid mine drainage from sources other than No. 15), the Commonwealth, upon discovering the discharge from No. 15, was confronted with the practical problem of how best to cope with this *additional pollution* of the Susquehanna River and particularly its West Branch.

We need not and do not pass upon the action taken by the Commonwealth in dealing with the problem. It undertook to treat the discharge by a liming process and, on August 7, 1970, initiated this action in equity against **Barnes & Tucker.** The original complaint sought, preliminarily and permanently, injunctive relief restraining Barnes & Tucker from operating No. 15[1] or directing that its mine drainage discharge be treated to meet specified water quality standards.[2]

Hearing on plaintiff's application for a preliminary injunction was fixed by the Court for August 26, 1970.

---

[1] At that time **Barnes & Tucker** had in fact ceased mining operations in No. 15.

[2] An amended complaint has since been filed which includes a request for additional relief allegedly consistent with a stipulation of the parties hereafter discussed.

However, on that day there was presented to the Court a rather unusual stipulation by the parties. It provided that the Commonwealth would continue its liming treatment of the discharge from No. 15 into the West Branch until Barnes & Tucker, in accordance with specifications contained in the stipulation, constructed and commenced operation of the Duman pumping and treatment facility at the southwest end of the mine with the expected result that the pumping operation at Duman would terminate discharge from the Buckwheat borehole and breakout area. Other provisions of the stipulation dealt with the costs of operating the two facilities and for ultimate responsibility of payment of costs incurred.

Germane to the present posture of this case and to the assumption by the Commonwealth of the operation of the Duman facility are additional provisions in the stipulation allowing Barnes & Tucker to terminate operation of the Duman facility[3] and for resumption of administrative adjudication procedures as to some of the issues here raised.

The Court accepted the stipulation, made it a part of the record but was not asked to and did not issue a preliminary injunction embodying the stipulation. Hearing on the preliminary injunction was indefinitely continued awaiting the outcome of administrative procedures which the parties had stipulated would be undertaken.

From August 26, 1970 until the Commonwealth renewed its application for preliminary injunction in early March of this year, further pollution of the West Branch has been effectively stayed and the source tributaries of the Allegheny River have been spared

---

[3] After a minimum of thirty days of operation and with notice to the Commonwealth of its intent to so terminate, in fact Barnes & Tucker ceased operating the Duman facility after 114 days.

substantial further pollution by reason of the operation of the Duman treatment facility, first by Barnes & Tucker and now by the Commonwealth. However, the original cooperation and concern by the parties, as demonstrated by the stipulation, has been displaced by disagreement and bickering, and progress towards an administrative adjudication of at least some of the issues now before us has been nonexistent due in part to the demise of the Sanitary Water Board upon the creation of the Department of Environmental Resources in January 1971.

The decision of Barnes & Tucker to terminate its responsibility for operating the Duman treatment facility—a right afforded to it under the stipulation—and the assumption of its operation by the Commonwealth prompted the Commonwealth to renew its application for preliminary injunction.

After eight days of hearings on preliminary injunction during which many witnesses, including experts, testified, and at which approximately 200 exhibits were introduced, only two things have emerged as being entirely clear; (1) that the underlying legal issues, including constitutional questions, present complex and novel questions with very little precedent in Pennsylvania jurisprudence, and (2) that a cessation of operation of the Duman pumping and treatment facility cannot be permitted to occur regardless of existing pollution of the waters of the Susquehanna River and the headwaters of the Allegheny River from sources other than discharge from No. 15. In essence, we conclude from the evidence that irreparable harm *would occur* if acid mine drainage from No. 15 is allowed to enter the waters of the Commonwealth without first being treated.

Defendant correctly contends that so long as the Commonwealth continues to operate the Duman facili-

ty irreparable harm is not occurring and is not likely to occur. From this it would have us conclude that the Commonwealth has failed to prove existing irreparable harm, a necessary ingredient to the issuance of a preliminary injunction. However, the Commonwealth is a volunteer in the operation of the facility and is under no legal duty to do so or continue to do so, just as Barnes & Tucker was under no legal duty (other than by stipulation of the parties) to operate the facility for the period it did pending a judicial determination of the issues before us.

Having concluded that irreparable harm would occur upon cessation of the operation of the facility, we cannot close our eyes to the potential irreparable harm if the Commonwealth as a volunteer decides as a policy matter to cease operation of the facility.

Thus, we further conclude, under the circumstances here presented, that irreparable harm although not presently existing is so close to reality, with calamitous results if it becomes a reality, that a court in the exercise of its equitable powers should consider threatened or potential irreparable harm as the equivalent of existing irreparable harm. *Commonwealth of Pennsylvania v. State of West Virginia,* 43 S. Ct. 658, 262 U.S. 553, affirmed on rehearing, 44 S. Ct. 123, 263 U.S. 350 (1923).

Another essential ingredient to the issuance of a preliminary injunction, particularly one requiring something to be done, is that it should be granted only where the right is clear. *McDonald v. Noga,* 393 Pa. 309, 141 A. 2d 842 (1958); *Schwab v. Pottstown Borough,* 407 Pa. 531, 180 A. 2d 921 (1962).

We have already observed that the basic legal issues in this case are complex and with little precedent in our body of law. The right of the Commonwealth to the relief it ultimately seeks is not clear at this point

in the case. Does this announced principle—as defendant contends—preclude the issuance of a preliminary injunction? We think not. While the power of a court of equity to issue preliminary injunctions should be withheld where the likelihood of plaintiff's eventual success may be remote—which necessarily requires some preliminary probing by the Court into the underlying legal issues—the clarity of right as declared in our decisional law deals with the right to the preliminary relief sought, not the ultimate relief sought. It would indeed be a rare case in which plaintiff's right to the ultimate relief sought is so clear prior to trial.

A review of many decisions in which there is announced the principle that a plaintiff's right to preliminary injunction should be clear convinces us that its very generality affords little guidance for its application in other cases, particularly in those cases, as in this one, where the public interest is so compelling. It would appear that this pronouncement is little more than an expression of caution that courts should exercise this equitable power with restraint.

Treating it as such, we view this case, based upon the evidence before us, as one (a) in which it has been demonstrated that irreparable harm will result if the Duman facility is not continued in operation, (b) in which the resulting harm to the public at large could not readily be corrected, and (c) in which the harm could not be measured in dollars nor compensated for in damages after the fact.

In the public interest, we are therefore constrained to take such steps as may be necessary to assure continued operation of the Duman facility pending final disposition of this litigation. In exercise of our power and discretion we shall also assign financial responsibility for such operation pending the outcome of this litigation. While this step may be both novel and un-

precedented we believe it both reasonable and proper to do so incident to litigation arising out of new concepts and untested law in the environmental field. In doing so we would note that our action is not a marked departure from that which the parties, in their stipulation before the Court, considered as an acceptable temporary solution to the problem posed by the acid mine drainage discharge from No. 15.

Accordingly, we enter the following

ORDER

Now, April 13, 1971, it is hereby decreed and ordered as follows:

1. Effective April 26, 1971, Barnes & Tucker Company shall assume exclusive responsibility for and undertake the operation of the Duman Dam pumping and treatment facility and (a) maintain a level of pumping necessary to avoid acid mine drainage discharge from Lancashire No. 15 from the Buckwheat borehole in the breakout area into the West Branch of the Susquehanna River, (b) maintain a treatment program of the discharge from Duman Dam to achieve at least equal water quality levels heretofore achieved in the operation of said treatment facility.

2. In operating the Duman Dam pumping and treatment facility Barnes & Tucker Company shall keep and maintain correct and adequate records separate from its regular books of account, of the actual cost of operating the Duman facility and the amount of capital expenditures deemed necessary to maintain the facility. Capital expenditures in excess of $200.00 shall, except in an emergency, have the prior approval of the Court.

3. Within five (5) days after the end of each thirty-day period of operation, Barnes & Tucker Company shall submit to the Department of Environmental Resources of the Commonwealth and to the Court a state-

ment of cost of operation and of capital expenditures made during each thirty-day period; and within ten (10) days thereafter, the Commonwealth shall pay to Barnes & Tucker Company one-half of the statement submitted. Failure of the Commonwealth to make payment as herein provided within the prescribed time shall work an automatic dissolution of this order from the date of such failure and Barnes & Tucker Company henceforth shall be under no duty or obligation by reason of this order to continue operation and maintenance of the Duman facility.

4. The expenditures made or paid by each of the parties under this order shall follow the final judgment in the case and be recovered by the successful party.

5. This order shall continue in effect, except as otherwise hereinbefore provided, until final determination of the case upon its merits or until further order of the court.

6. This order is not intended to nor shall it be construed to alter or change the rights and responsibilities of the parties under their Stipulation and Supplemental Stipulation of August 26, 1970 with respect to the construction and operation of the Duman Dam pumping and treatment facility prior to April 26, 1971 nor to other provisions of said Stipulation and Supplemental Stipulation outside the scope of this order.