392

Commonwealth, Appellant, *v.* Barnes & Tucker Company.

Argued November 16, 1973.    Before Jones, C. J., Eagen, O'Brien, Roberts, Pomeroy and Nix, JJ.

reargument refused May 31, 1974.

K. W. *James Rochow,* Assistant Attorney General, with him *Michael S. Alushin,* Assistant Attorney General, for Commonwealth, appellant.

*Cloyd R. Mellott,* with him *C. Arthur Wilson, Jr., John R. Kenrick, Frank A. Sinon, Eckert, Seamans, Cherin & Mellott,* and *Rhoads, Sinon & Reader,* for appellee.

OPINION BY MR. CHIEF JUSTICE JONES, March 25, 1974:

Appellee, Barnes & Tucker Company, engaged in active deep mining operations at Lancashire Mine No. 15 in Cambria County from 1939 until July 1969, at which time the mine was closed and sealed. Following closure, Mine No. 15 began to inundate and in June and July of 1970 substantial discharges of acid mine drainage were discovered at two different locations. Without detailing the factual posture which will be discussed *infra,* the events which precipitated this appeal are as

follows.[1] The Department of Environmental Resources filed a complaint in equity in the Commonwealth Court on August 7, 1970, seeking preliminary and permanent mandatory injunctions requiring Barnes & Tucker to treat the efflux from Mine No. 15. After attempts by the Commonwealth and Barnes & Tucker to resolve their differences inter se had failed, a preliminary injunction hearing was begun on March 5, 1971, and was completed on March 25, 1971. In the interim, the Commonwealth had filed an amended complaint on March 17, 1971, which consisted of four counts. Three of the counts were based on The Clean Streams Law,[2] and the remaining count was based on a common law nuisance theory.

A preliminary injunction was issued by the Commonwealth Court on April 13, 1971, requiring the continuation of treatment facilities until final determination of the action on the merits with the parties sharing the costs on an equal basis. 1 Pa. Commonwealth Ct. 552 (1971). On the merits of granting permanent injunctive relief, however, the Commonwealth Court found that Barnes & Tucker was not liable for the abatement of the discharge from Mine No. 15 under any of the Commonwealth's four theories. *Commonwealth v. Barnes & Tucker Co.*, 9 Pa. Commonwealth Ct. 1, 303 A. 2d 544 (1973). From that decree the Commonwealth's appeal followed.

This appeal presents significant questions concerning the power of the Department of Environmental Resources[3] to enjoin acid mine drainage from abandoned

---

[1] For a more detailed discussion of the factual and procedural posture of this case, see the opinion of the Commonwealth Court at 9 Pa. Commonwealth Ct. 1, 303 A. 2d 544 (1973).

[2] Act of June 22, 1937, P. L. 1987, *as amended*, 35 P.S. §691.1 *et seq. See* Section I, *infra.*

[3] Prior to the Act of December 3, 1970, P. L. 834, §30, 71 P.S. §510-103, the Sanitary Water Board was responsible for mine drain-

mines. In some respects, this is a case of first impression in this Commonwealth, requiring an analysis of The Clean Streams Law and the law of public nuisance. Due to the complexity of the legal questions involved, a preliminary investigation of the procedural and factual posture of this case juxtaposed with a discussion of the evolution of Clean Streams legislation in the Commonwealth we deem useful.

## I.

The Clean Streams Law was first enacted by the Act of June 22, 1937, P. L. 1987. Prior to its passage, the pertinent legislation was the Purity of Waters Act of April 22, 1905, P. L. 260, which regulated the discharge of sewage into the waters of the Commonwealth. It was specifically provided, however, that this act was not to apply to "waters pumped or flowing from coal mines. . . ." Likewise, the Act of June 14, 1923, P. L. 793, which authorized the Department of Health to promulgate orders and regulations for the prevention of pollution, similarly exempted coal mine discharges.

The Clean Streams Law, as enacted in 1937, took a middle ground with reference to mine drainage, as it provided that: "The provisions of this article shall not apply to acid mine drainage and silt from coal mines until such time as, in the opinion of the Sanitary Water Board, practical means for the removal of the polluting properties shall become known." 35 P.S. §691.310.

The Act of May 8, 1945, P. L. 435, significantly amended The Clean Streams Law in several respects. Section 2, the definitional section, redefined "establishment" to include coal mines and broadened the definition of "pollution" to include discharges from coal

age. By this Act, however, the Sanitary Water Board was abolished and its functions were taken over by the Department of Environmental Resources.

mines. Section 309, which imposed penalties for discharge of industrial waste into the waters of the Commonwealth, was also amended to cover acid mine drainage. Section 310 was also amended, further bringing the treatment of acid mine drainage into parity with other sources of pollution. By these amendments Section 310 read, *inter alia*:

"Except as hereinafter provided, the provisions of this article shall not apply to acid mine drainage from coal mines until such time as, in the opinion of the Sanitary Water Board, practical means for the removal of the polluting properties of such drainage shall become known.

"It shall be unlawful and a nuisance to discharge, or to permit the discharge, of acid mine drainage (1) into 'clean waters' of the Commonwealth which are being devoted or put to public use at the time of such discharge; or (2) into 'clean waters' of the Commonwealth, unless the Commonwealth, after the Sanitary Water Board has approved plans of drainage pursuant to section three hundred thirteen hereof, and has set a reasonable time not to exceed one year within which such pipes, conduits, drains, tunnels or pumps as may be necessary to receive such acid mine drainage at the point or points where such acid mine drainage is delivered, as provided in this section, shall be constructed and put into operation by the Commonwealth, has failed to construct and put into operation the same within such time: Provided, That nothing in this amendatory act shall be construed to limit or affect the provisions of section seven hundred one of the act to which it is an amendment."

A new Section 313 was added by the 1945 amendments to read in part as follows: "Before any existing or new coal mine may be opened or reopened, and before any existing coal mine may be continued in operation, a plan of the proposed drainage and disposal of

industrial wastes, and acid mine drainage of such mine, shall be submitted to the Sanitary Water Board, and it shall be unlawful to open or reopen any such mine, or to continue the operation of any mine, or to change or alter any already approved plan of drainage and disposal of industrial wastes, and acid mine drainage from such mine, unless and until the board, after consultation with the Department of Mines has approved such plan or change of plan. . . ."

In 1965 The Clean Streams Law was again substantially altered by the Act of August 23, 1965, P. L. 372. A new section was added which detailed legislative findings and declarations of policy:

"Section 4. Findings and Declarations of Policy.— It is hereby determined by the General Assembly of Pennsylvania and declared as a matter of legislative findings that:

"(1) The Clean Streams Law as presently written has failed to prevent an increase in the miles of polluted water in Pennsylvania.

"(2) The present Clean Streams Law contains special provisions for mine drainage that discriminate against the public interest.

"(3) Mine drainage is the major cause of stream pollution in Pennsylvania and is doing immense damage to the waters of the Commonwealth.

"(4) Pennsylvania, having more miles of water polluted by mine drainage than any state in the nation, has an intolerable situation which seriously jeopardizes the economic future of the Commonwealth.

"(5) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry, and

"(6) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead.

"The General Assembly of Pennsylvania therefore declares it to be the policy of the Commonwealth of Pennsylvania that:

"(1) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted, and

"(2) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth." The definitional section was amended to include mine drainage within the definition of "industrial waste," 35 P.S. §691.1, thus bringing acid mine drainage within the prohibition of Section 307, which remained essentially unchanged since originally enacted in 1937 and which provided in part: "No person shall hereafter erect, construct or open, or reopen or operate, any establishment which, in its operation, results in the discharge of industrial wastes which would flow or be discharged into any of the waters of the Commonwealth and thereby cause a pollution of the same, unless such person shall first provide proper and adequate treatment works for the treatment of such industrial wastes, approved by the board, so that if and when flowing or discharged into the waters of the Commonwealth the effluent thereof shall not be inimical or injurious to the public health or to animal or aquatic life, or prevent the use of water for domestic, industrial or recreational purposes. . . ."

Sections 310, 311, 312 and 313 were repealed by the 1965 Act, but an important new Section 315 was added which provided:

"(a) Before any coal mine is opened, reopened, or continued in operation, an application for a permit approving the proposed drainage and disposal of industrial wastes shall be submitted to the Sanitary Water

Board. The application shall contain complete drainage plans including any restoration measures that will be taken after operations have ceased and such other information as the board by regulation shall require.

"(b) It shall be unlawful to open, reopen, or continue in operation any coal mine, or to change or alter any approved plan of drainage and disposal of industrial wastes, unless and until the board, after consultation of the Department of Mines and Mineral Industries, has issued a permit approving the plan or change of plan. A permit shall not be issued if the board shall be of the opinion that the discharge from the mine would be or become inimical or injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation. In issuing a permit the board may impose such conditions as are necessary to protect the waters of the Commonwealth. The permittee shall comply with such permit conditions and with the rules and regulations of the board.

"(c) The board may modify, suspend or revoke any permit issued pursuant to this section. Such action may be taken if the board finds that a discharge from the mine is causing or is likely to cause pollution to waters of the Commonwealth or if it finds that the operator is in violation of any provision of this act or any rule or regulation of the Sanitary Water Board. An order of the board modifying, revoking or suspending a permit shall take effect upon notice from the board, unless the order specifies otherwise. Any party aggrieved by such order shall be given the opportunity to appear before the board at a hearing at which the board shall reconsider its order and issue an adjudication, from which the aggrieved party may appeal in the manner provided by the 'Administrative Agency Law,' act of June 4, 1945 (P. L. 1388), as amended. The right of the board to suspend or revoke a permit is in addi-

tion to any penalty which may be imposed pursuant to this act.

"(d) Any permit approving the drainage and disposal of industrial wastes from a coal mine and issued by the board prior to the effective date of this act shall be deemed to be a permit issued pursuant to this section. The permit shall be valid for one year from the effective date of this act or for such additional period as the board might allow. Nothing herein shall limit the board's power to modify, suspend, or revoke any such permit under the provisions of subsection (c) of this section."

The most recent amendments to The Clean Streams Law were effected by the Act of July 31, 1970, P. L. 653, and again significantly altered the prior law. It is clear that the 1970 amendments extended the Board's control over mining to include regulation of all operations and discharges. Section 307 now reads in part: "No person . . . shall discharge or permit the discharge of industrial wastes in any manner . . . into the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the board or such person . . . has first obtained a permit from the department. . . ." To the same end, Section 315 (a) now reads in part: "No person . . . shall operate a mine or allow a discharge from a mine into the waters of the Commonwealth unless such operation or discharge is authorized by the rules and regulations of the board or such person . . . has first obtained a permit from the department."

Section 316, which had been added in 1965 to require landowners and occupiers to allow access to the land so that appropriate corrective measures could be taken, was significantly changed. That section now provides a separate basis for the imposition of liability for pollution "from a condition which exists on the land."

The apposition and effect of The Clean Streams Law, and its various amendments, to this litigation are crucial to the resolution of at least three issues raised and will be discussed at length *infra*.

## II.

Mine No. 15 is a bituminous deep coal mine located in the B seam of coal in the Barnesboro Basin area of Cambria and Indiana Counties near the headwaters of the West Branch of the Susquehanna River. The mine contains approximately 6,600 acres, most of which is located in the lowest section of the basin. The mine was first opened in 1915 and following a series of different operators, Barnes & Tucker took over operation of the mine in 1939 when it acquired the assets of its subsidiary, Barnes Coal Company, upon that company's dissolution. During the operation of the mine by Barnes & Tucker, four different certificates or permits were issued by the Sanitary Water Board for acid mine discharge in connection with the operation of Mine No. 15.

The first certificate of approval of mine drainage, Certificate No. 892, was issued by the Sanitary Water Board on July 22, 1948, pursuant to power conferred upon the Board in the 1945 amendments. The drainage plan provided for discharge into Little Brown's Run, which empties into Brown's Run, and eventually into the West Branch of the Susquehanna River.

On March 25, 1960, Permit No. 14,326 (sometimes referred to as Permit No. 19124-M) was issued in response to an application of Barnes & Tucker. The plan of drainage approved therein provided for the discharge to be pumped through a borehole into Crooked Run, a tributary of Elk Creek, which flows into the North Branch of Black-Lick Creek which, in turn, flows into the Conemaugh River. These waters are in the Allegheny watershed.

In 1964 Barnes & Tucker wished to open a new mine in the Barnesboro Basin to conduct mining operations in both the B and D seams of coal (Mine No. 24). It was thus necessary to obtain an additional permit to cover these proposed operations. An application was made to cover a proposed plan of drainage for all of Barnes & Tucker's mining operations in both the B and D seams. On December 21, 1964, Permit No. 564M5 was issued approving the proposed plan of drainage, which for Mine No. 15 was the same as it had been under Permit No. 14,326.

As previously stated, the 1965 amendments significantly expanded the scope of The Clean Streams Law by proscribing the discharge of acid mine drainage into *all* waters of the Commonwealth and not just "clean" waters. The 1965 amendments became effective January 1, 1966. Prior permit holders were treated in Section 315(d) of the Act, which provided: "Any permit approving the drainage and disposal of industrial wastes from a coal mine and issued by the board prior to the effective date of this act shall be deemed to be a permit issued pursuant to this section. The permit shall be valid for one year from the effective date of this act or for such additional period as the board might allow. Nothing herein shall limit the board's power to modify, suspend, or revoke any such permit under the provisions of Subsection (c) of this section." Pursuant to this section, Barnes & Tucker applied for and was granted three extensions of time to operate under its mine drainage permit No. 564M5, subject to certain conditions. The last extension was effective until May 31, 1969. During the period of these extensions, however, Barnes & Tucker filed an application for a new mine drainage permit to cover both Mines Nos. 15 and 24 on a form prescribed for post-1965 amendment permits. This application was filed on October 17, 1967, and on March 22, 1968, Permit No. 567M035 was issued. The

Commonwealth Court made no finding with regard to which permit or permits Mine No. 15 was being operated under during the period from March 1968 until May 1969.[4] In light of Section 315(d), even a time-extended permit originally issued prior to the effective date of the 1965 amendments was to be treated as if issued pursuant to those amendments. Furthermore, under both permits the plan of drainage for Mine No. 15 was the same. Consequently, the only legal relevance in a determination of the governing drainage permit would be the effect of the conditions imposed upon the issuance of Permit No. 567M035 and Permit No. 564M5 and the extensions thereto. An analysis of the Board's power to impose conditions upon permits and the effect of those conditions upon the issues presented in this case will be pursued *infra.*

### III.

The Commonwealth Court framed the legal issues involved in this case as follows:

"1. Under the provisions of The Clean Streams Law then in effect, did B & T [Barnes & Tucker] as a holder of time extended permit No. 564M5 or permit No. 567M035 (the 1965 amendment permit) assume responsibility for mine water discharge from Mine No. 15 after cessation of mining and thereby also become responsible for its treatment to meet minimum water quality standards established by the Commonwealth?

"2. Did the mine water discharge emanating from Mine No. 15 impose any responsibility upon B & T for abatement of the polluting qualities of the discharge under Section 316 of The Clean Streams Law as then in effect?

"3. Did the mine water discharge emanating from Mine No. 15 constitute a public nuisance under Section

---

[4] After the issuance of Permit No. 567M035, two additional extensions to Permit No. 564M5 were granted.

3 of The Clean Streams Law as then in effect for which B & T is responsible and which it must abate?

"4. Did the mine water discharge emanating from Mine No. 15 constitute a common law public nuisance for which B & T is responsible and which it must abate?" Since the Commonwealth Court resolved all four of these questions in favor of Barnes & Tucker, a discussion of the constitutional question of imposing responsibility on Barnes & Tucker and the issues of estoppel, laches, and waiver against the Commonwealth was obviated. The findings of fact by the court below are supported by the record and will not be disturbed on appeal. In the application of the law to these facts, however, we are not in total accord with the Commonwealth Court, and, accordingly, we reverse. This disposition will therefore necessitate not only our review of those questions decided below, but also a discussion of the questions of constitutionality, waiver, estoppel, and laches.

The Commonwealth first contends that Section 315 of the *1965* Clean Streams Law[5] imposes responsibility upon Barnes & Tucker to abate or treat the discharge from Mine No. 15. This contention is trifurcate: (1) Section 315 expressly imposed such responsibility; (2) the regulations and conditions attached to the drainage permit imposed such responsibility; or (3) but for Barnes & Tucker's deception the Board would have imposed such responsibility by means of regulation or condition upon the permit.

As earlier discussed, the 1965 amendments to The Clean Streams Law reflected a significant change in legislative policy towards polluting emissions from coal mines. The principal effect of the 1965 amendments was to extend the coverage of the permit provisions by

---

[5] Since a claim under Section 315 of the *1970* law was not raised by the Commonwealth, we will not raise it sua sponte.

eliminating any distinction between discharges into clean and unclean streams. Despite the expression of legislative policy that the objective of the 1965 amendments was "not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted," 35 P.S. §691.4, the 1965 amendments did not provide a blanket interdiction of polluting discharges from coal mines. Section 315 appertained to *opening, reopening,* or *operating* a coal mine.[6] Likewise, Section 307 spoke of the discharge of industrial wastes resulting from the *operation* of an establishment. Although the 1965 amendments required a drainage permit for discharges into "unclean" waters for the first time, Section 306 (repealed in 1970), which broadly proscribed the discharge of industrial waste into the waters of the Commonwealth, was retained after the 1965 amendments, and was limited to the protection of *clean* waters. The discharge in this case is admittedly not into clean waters. We therefore find, as did the Commonwealth Court, that The Clean Streams Law of 1965, and in particular Section 315, did not expressly impose responsibility upon Barnes & Tucker to abate or treat post-mining discharges.[7]

---

[6] Section 315(a) dealt with the requirement for a permit before "any coal mine is opened, reopened, or continued in operation." Section 315(b) interdicts opening, reopening, or operating a coal mine without or in derogation of a drainage permit. This subsection also provides the authority for the Board to promulgate rules and regulations and to impose conditions upon the grant of a drainage permit. Section 315(c) deals with modification, suspension, and revocation of drainage permits, and Section 315(d) deals with pre-1965 amendment permits.

[7] This determination is not influenced by the fact that the Legislature in 1965 also enacted the Act of December 15, 1965, P. L. 1075, 35 P.S. §760.1 *et seq.*, which was to alleviate pollution of streams from abandoned coal mines by granting certain duties and powers to the Department of Mines and Mineral Industries.

Although The Clean Streams Law did not expressly speak to post-mining discharges as of 1965, it did empower the Board to promulgate rules and regulations, to attach conditions to permits, and to require permit applications to contain "complete drainage plans including any restoration measures that will be taken after operations have ceased. . . ." This grant of administrative power, however, must be viewed in the context of the enabling statutory section. In this case, that section deals with drainage permits. Accordingly, the *only* sanctions provided by Section 315 of the 1965 law for the violation of a rule or regulation of the Board, or the breach of a permit condition, are modification, suspension, or revocation of the permit as provided in Section 315(c).[8] We are not called upon to rule on the propriety of the Board's revocation of Permit No. 567M035 because of post-mining discharges from Mine No. 15.[9] Nor because of the limited sanctions provided in Section 315, which do not include injunctive relief, need we review the Administrative Rules and Regulations of the Board on the conditions attached to either Permit No. 564M5 or Permit No. 567M035, since such review could have no bearing on this action for a mandatory injunction. The relief sought by the Commonwealth cannot, therefore, be premised on this theory.

The second count of the Commonwealth's amended complaint asserts responsibility upon Barnes & Tucker

---

[8] To the contrary, Section 315 of the 1970 Clean Streams Law and Section 307, both after and prior to the 1970 amendments, provided for the abatement of the discharge through Section 601, 35 P.S. §691.601.

[9] In this regard we note that the wisdom of the decisions in *Sanitary Water Board v. Sunbeam Coal Corp.*, 77 Dauph. 264 (1961), and 47 Pa. D. & C. 2d 378 (Dauphin Co. 1969), cited by Barnes & Tucker is not now before us and that those decisions are inapposite to the disposition of this appeal.

for the post-mining discharge by reason of Section 316 of the 1970 Clean Streams Law. This section provides in part:

"Whenever the Sanitary Water Board finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth the board may order the landowner or occupier to correct the condition in a manner satisfactory to the board or it may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action. For the purpose of this section, 'landowner' includes any person holding title to or having a propriety interest in either surface or subsurface rights.

"For the purpose of collecting or recovering the expense involved in correcting the condition, the board may assess the amount due in the same manner as civil penalties are assessed under the provisions of section 605 of the act: Provided, however, That if the board finds that the condition causing pollution or a danger of pollution resulted from mining operations conducted prior to January 1, 1966, or, if subsequent to January 1, 1966, under circumstances which did not require a permit from the Sanitary Water Board under the provisions of section 315(b) of this act as it existed under the amendatory act of August 23, 1965 (P. L. 372), then the amount assessed shall be limited to the increase in the value of the property as a result of the correction of the condition."

The remedies provided in Section 316 are statutorily created, and as such are to be strictly construed. In the present case, there was no administrative order. Consequently, even if the facts of this case would warrant relief under Section 316, such relief would not be obtainable through an original equity action in the Com-

monwealth Court.[10] The Commonwealth's reliance on that section is therefore inapt.

The third and fourth bases upon which the Commonwealth claims relief should be granted are the doctrines of statutory and common law public nuisances. We find that relief may be granted under *either* of these theories. In order to correct what we believe to be a misinterpretation of The Clean Streams Law and the law of public nuisance, we think it advisable to discuss *both* theories.

Section 3 of The Clean Streams Law has provided since July 31, 1970, that: "The discharge of sewage or industrial waste or any substance into the waters of this Commonwealth, which causes or contributes to pollution as herein defined or creates a danger of such pollution is hereby declared not to be a reasonable or natural use of such waters, to be against public policy and to be a public nuisance." Section 601 of the 1970 Clean Streams Law provides for the abatement of nuisances. That section provides in part: "(a) Any activity or condition declared by this act to be a nuisance, shall be abatable in the manner provided by law or equity for the abatement of public nuisances."

The Commonwealth's amended complaint contained reference to both of these sections and was filed almost eight months after the effective date of the 1970 amendments. Since the Commonwealth's prayer for relief—abatement of a nuisance—is prospective, the 1970 amendments are clearly applicable. However, although the Commonwealth Court set forth Section 3 of the 1970 law in its opinion, the Court did not appear to

---

[10] *See* Section 610 of The Clean Streams Law, 35 P.S. §691.610, regarding enforcement orders, and Section 1917-A of The Administrative Code, 71 P.S. §510-17, regarding the powers and duties of the Department of Environmental Resources to abate or remove nuisances.

consider this section in its disposition. To the contrary, the Court spoke of the legislative history *prior* to 1970, the failure of the Commonwealth to assert that the waters here involved were "clean waters," and Section 310 of The Clean Streams Law. Although Section 310 of The Clean Streams Law declared the discharge of acid mine drainage into "clean waters" to be a public nuisance, this section was repealed in 1965 and would have no bearing on the present case even if the receiving stream were unpolluted. Section 3 is very clear and not difficult of application. The record fully supports a finding that the discharge causes or *contributes* to the pollution of the receiving stream, or at the least *creates a danger* of such pollution. We are therefore of the opinion that Section 3 *on its face* does provide the Commonwealth a remedy.

Barnes & Tucker argues that the limited applicability of Section 315(a) of the 1970 law to only those post-mining discharges where mining operations have occurred subsequent to January 1, 1966, under conditions requiring a permit pursuant to Section 315(b) of the 1965 law, should likewise obtain to Section 3. Without adjudging the merits of this contention, we believe that the result we reach would be unaffected by such a limitation. Whether Barnes & Tucker was operating Mine No. 15 prior to closure under either Permit No. 564M5 or Permit No. 567M035, it was operated under circumstances requiring a permit under Section 315(b) of the 1965 law for purposes of the limitation in Section 315(a) of the 1970 law. We reach this conclusion without making a finding as to which permit or permits Barnes & Tucker operated under subsequent to January 1, 1966, because Permit No. 567M035 *was issued* pursuant to Section 315(b) of the 1965 law and Permit No. 564M5, although issued prior to the effective date of the 1965 law, is, under Section 315(d) of

the 1965 law, *deemed to be issued* pursuant to this section, *i.e.,* pursuant to Section 315(b).

Our holding in regard to the Commonwealth's claim based on Section 3 of the 1970 Clean Streams Law is not inconsistent with our ruling on the first claim based on Section 315. In ruling upon that contention we restricted our discussion to the 1965 law because the Commonwealth had so based its claim. The 1970 law, however, significantly altered Section 315 and would, on its face, provide a basis of relief. That section now provides in pertinent part: "No person . . . shall . . . allow a discharge from a mine . . . unless such . . . discharge is authorized by the rules and regulations of the board or such person . . . has first obtained a permit from the department. . . . A discharge from a mine shall include a discharge which occurs after mining operations have ceased, provided that the mining operations were conducted subsequent to January 1, 1966, under circumstances requiring a permit from the Sanitary Water Board under the provisions of section 315(b) of this act as it existed under the amendatory act of August 23, 1965 (P. L. 372). The . . . allowing of any discharge without a permit or contrary to the rules and regulations of the board, is hereby declared to be a nuisance."

The Commonwealth's fourth basis for relief is under the theory of common law public nuisance. Although ordinarily we would not discuss an alternative basis of liability, having already found liability to exist under one theory, we feel that the Commonwealth Court's misconstruction of this evasive area of the law compels comment by this Court.

Dean Prosser has aptly stated that "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance'." W. Prosser, *Law of Torts,* §87 (3d Ed. 1964). Aside from the conceptual problem in recognizing that nuisance involves an area of tort liability and not a type of tor-

tious conduct, much of the confusion surrounding nuisance law has resulted from the divergent interests protected, which respectively give rise to liability for private and public nuisance. Much of the confusion enshrouding the field of nuisance law in this Commonwealth with regard to coal mines has emanated from this Court's opinion in *Pennsylvania Coal Co. v. Sanderson*, 113 Pa. 126, 6 A. 453 (1886). Although never expressly overruled, *Sanderson* has consistently been distinguished and limited to its facts. *See, e.g., McCune v. Pittsburgh & Baltimore Coal Co.*, 238 Pa. 83, 85 A. 1102 (1913); *Sullivan v. Jones & Laughlin Steel Co.*, 208 Pa. 540, 57 A. 1065 (1904) (The *Sanderson* doctrine "has never been and never ought to be extended beyond the limitations put upon it by its own facts." *Id.* at 549, 57 A. at 1068); *Hindson v. Markle*, 171 Pa. 138, 33 A. 74 (1895). *Sanderson* dealt with private nuisance and is therefore inapposite to the present case. In any event, we find that even with regard to the facts of *Sanderson*, the legal doctrine enunciated in that case is no longer viable.[11]

Although the Commonwealth Court recognized that *Sanderson* was a private nuisance case and that its doctrine has been severely limited, it nevertheless seemed to rely on that case. Furthermore, the Commonwealth Court weakly distinguished the only two public nuisance cases it discussed. We find these two cases, *Pennsylvania R. R. v. Sagamore Coal Co.*, 281 Pa. 233, 126

---

[11] One commentator has put the *Sanderson* case in a class with the case of *Noonan v. Pardee*, 200 Pa. 474, 50 A. 255 (1901), a case in which this Court held that the statute of limitations for a cause of action for the subsidence of the surface caused by the mining of a coal vein ran from the date of the removal of the coal and not from the date of the subsidence. That commentator felt that *Noonan* "is worthy only of a place beside the notorious Sanderson case . . . in which, as was said by one of the greatest lawyers this state ever produced, the court held a pump to be a natural watercourse." 12 P.S. §31, n. 126 at 74 (1953).

A. 386 (1924), and *Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co., Inc.,* 367 Pa. 40, 79 A. 2d 439 (1951), to be pertinent to this case and to support the Commonwealth's theory.

*Sagamore* involved an appeal from the dismissal of a complaint in equity which sought to prevent the discharge of acid mine drainage into Indian Creek, in Fayette County. In *Sagamore,* as in the present case, discussion both on oral argument and in the exhaustive briefs took a wide range. This Court, however, succinctly limited the area of relevant inquiry in *Sagamore*: "the controversy . . . is controlled by one fact and a single equitable principle: the fact that the stream has been polluted, and the principle that this creates an enjoinable nuisance, if the public uses the water." 281 Pa. at 238, 126 A. at 387. We find this an accurate precis of public nuisance law and apposite to the present case.

The Commonwealth Court attempted to distinguish *Sagamore* on the basis that that case involved a pure stream used as a supply of water for domestic consumption for a large segment of the public. Those factors were important there to establish a public use of the water. In the present case the Commonwealth Court found that the only public use of these waters was a developing recreational use. We need not decide whether such a use is sufficient in itself upon which to base injunctive relief, since we believe the public has a sufficient interest in clean streams alone regardless of any specific use thereof. Toward this end we are mindful of article I, Section 27, of the Pennsylvania Constitution, which provides: "Section 27. Natural Resources and the Public Estate. The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic, and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including gener-

ations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people." As this Court recently stated in *Commonwealth v. Harmar Coal Co.*, 452 Pa. 77, 94, 306 A. 2d 308, 317 (1973): "There cannot be any doubt that an overriding public interest in acid mine drainage control does exist."

The Commonwealth Court also attempted to distinguish *Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co., Inc.*, 367 Pa. 40, 79 A. 2d 439 (1951), wherein this Court held that corruption of water which affects the public use of a stream or menaces the public health becomes a public nuisance which the Commonwealth may seek to abate. *Shumaker* involved the discharge of twenty million gallons of polluted water from a pulp and paper mill into the waters of the Commonwealth. The bill in equity in *Shumaker* was based on theories of statutory and common law public nuisance, both of which this Court found to be proper jurisdictional subjects of the court below. The Commonwealth Court found the statements of law contained in *Shumaker* to be inapplicable presently because they were "made in the context of the discharge of industrial wastes—as then defined by the statute— . . . by the operator of a pulp and paper mill and at a time in the legislative history of The Clean Streams Law which excluded mine drainage from not only regulatory control but from the definition of industrial waste." 9 Pa. Commonwealth Ct. at 57, 303 A. 2d at 571. The logic of the Commonwealth Court in this regard is perplexing since *now*, when we are applying the principles of *Shumaker* to the facts of this case, The Clean Streams Law includes mine drainage in its regulatory scheme, and declares such to be a public nuisance. The Act does not grant any preferred status to mine owners and operators in the discharge of pollutants into Pennsylvania waters.

The absence of facts supporting concepts of negligence, foreseeability or unlawful conduct is not in the least fatal to a finding of the existence of a common law public nuisance. The assumption that such might be the case is "based upon an entirely mistaken emphasis upon what the defendant has done rather than the result which has followed, and forgets completely the well established fact that negligence is merely one type of conduct which may give rise to a nuisance." W. Prosser, *Law of Torts*, §88 at 595 (3d ed. 1964).

We note here that a placing of responsibility upon Barnes & Tucker for abating the polluting discharges from Mine No. 15 is not inconsistent with the Act of December 15, 1965, P. L. 1075, 35 P.S. §760.1 *et seq.* which deals with pollution from abandoned mines and provides in part: "§760.1. Program to correct. The Secretary of the Department of Mines and Mineral Industries shall initiate an immediate action program to correct pollution from abandoned deep and strip mines on each of the watersheds in the Commonwealth of Pennsylvania." This legislation is directory and not mandatory, and in any event is intended to provide an *additional* means to remedy such pollution, not the *only* means.

## IV.

Having determined that there is a basis upon which the Commonwealth *could* be granted relief, we must now determine whether relief *should* be granted. Prior to such determination, however, we dismiss the defense raised by Barnes & Tucker of legislative authority. Although it is true that the legislature, within constitutional limitations, may authorize that which would otherwise be a nuisance, there has been no such authorization. Nor can such authorization be inferred vis-a-vis the express legislative declaration of nuisance. Furthermore, the fact that Barnes & Tucker operated in accord-

ance with The Clean Streams Law cannot give rise to the conclusion that the discharge of acid mine drainage during such operation was *authorized* by that law. At best it can be concluded that such discharges were *permitted*.[12]

We next address the question of whether the Commonwealth is barred in this action under doctrines of laches, waiver, or estoppel. The Commonwealth is certainly not chargeable with laches. The polluting discharges here in question first occurred in June of 1970 and a complaint was filed by the Commonwealth in this case less than two months thereafter.

Nor can the Commonwealth be held to have waived the right to enjoin the discharge from Mine No. 15 into the Susquehanna watershed or to be estopped from doing so. The facts of this case show that the last time Barnes & Tucker had been allowed by permit to discharge mine drainage into the Susquehanna watershed was in 1960, over ten years prior to the commencement of this action. Even if such were not the facts, stream polluters can acquire no prescriptive or property right to pollute as against the Commonwealth no matter how long their conduct has been tolerated. *Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co., Inc.*, 367 Pa. 40, 45, 79 A. 2d 439, 444 (1951) ; *Pennsylvania R. R. v. Sagamore Coal Co.*, 281 Pa. 233, 249, 126 A. 386, 391 (1924). Furthermore, Section 701 of The Clean Streams Law, 35 P.S. §691.701, specifically speaks to this question: "It is hereby declared to be the purpose of this act to provide additional and cumulative remedies to abate the pollution of the waters of this Commonwealth, and nothing in this act contained shall in any way abridge or alter rights of action or remedies now or hereafter existing in equity, or under the common law or statutory law, criminal or civil, nor

---

[12] We are not called upon to decide the more difficult question of whether a public nuisance can exist during the pendency of a valid mine drainage permit.

shall any provision in this act, or the granting of any permit under this act, or any act done by virtue of this act, be construed as estopping the Commonwealth, persons or municipalities, in the exercise of their rights under the common law or decisional law or in equity, from proceeding in courts of law or equity to suppress nuisances, or to abate any pollution now or hereafter existing, or enforce common law or statutory rights."

The imposition of liability in this case also requires our consideration of constitutional objections based on the Fourteenth Amendment to the United States Constitution and article I, Section 10, of the Pennsylvania Constitution. We do not believe that a finding of liability for and responsibility to abate the discharge from Mine No. 15 would deny Barnes & Tucker due process of law,[13] or equal protection of the law,[14] in

---

[13] Several questions which were previously discussed in another context might also be raised here under a due process argument. They include the facts that the Commonwealth had not in the past moved to enjoin the discharge of mine drainage during the operation of Mine No. 15 and that the operation of Mine No. 15 was in accordance with The Clean Streams Law. These contentions do not raise additional due process problems. Not only can one not obtain a prescriptive right to maintain a public nuisance, but where the state police power is found to exist, it is not lost by non-exercise, but remains to be exerted as local exigencies may demand. *Kelly v. Washington*, 302 U.S. 1, 14 (1937). As to the second contention, the United States Supreme Court noted in *Queenside Hills Co. v. Saxl*, 328 U.S. 80, 83 (1946), that: "In no case does the owner of property acquire immunity against exercise of the police power because he constructed it in full compliance with the existing laws."

[14] We summarily dismiss Barnes & Tucker's claim that the prosecution of this action constitutes a denial of the equal protection of the laws. There has been no showing that the Commonwealth's action was an intentional discrimination in the enforcement of the law. Indeed, since to a large extent this is a case of first impression, and recognizing the substantial costs of litigation here involved, it is only reasonable that the Commonwealth await the ultimate outcome of this case before bringing similar actions.

violation of either the United States or Pennsylvania constitutions.

Initially we dismiss the contention that Section 3 of The Clean Streams Law, as amended in 1970 is a retrospective law. This section is merely declaratory of the common law which at all times provided for the abatement of pollution of waters of the Commonwealth. Even if we treat the sections of The Clean Streams Law which from time to time exempted mine drainage from regulation, as legislative authority for such drainage, that authority ceases when such legislation is repealed or amended. *Wartman v. Philadelphia,* 33 Pa. 202 (1859). Legislative withdrawal of a prior grant of a privilege is not retrospective legislation. Nor do we think this result to be unfair, especially under the facts of this case. During the time that Mine No. 15 was operated pursuant to a mine drainage permit, Barnes & Tucker had, *at best,* a limited privilege to discharge untreated acid mine drainage. Moreover, at all times permit holders were on notice that the exemption from regulation of acid mine drainage was applicable only until "practical means for the removal of the polluting properties of such drainage shall become known." 35 P.S. §691.310 (repealed 1965). Permit holders were also forewarned of the possibility of future regulations of mine drainage in Section 701 of The Clean Streams Law, discussed, *supra,* and in the standard conditions accompanying all permits.[15] Even if liability for the discharge of mine drainage was made abatable for the

---

[15] *See, e.g.,* Standard Conditions Relating to Mine Drainage, dated May 18, 1961, providing, *inter alia*: "FOURTEENTH: Nothing herein contained shall be construed to be an intent on the part of the Sanitary Water Board to approve any act made or to be made by the permittee inconsistent with the permittee's lawful powers or with existing laws of the Commonwealth regulating industrial wastes and mine drainage or the practice of professional engineering, nor shall be construed as approval of the structural adequacy of any structures; nor shall this permit be construed to permit any

first time under any theory by the 1970 amendments, a recognition of the Commonwealth's claim based thereon would not require that we place a retrospective construction on these amendments. Rather, we would be applying that section to a condition which existed on the date when the amendments covering discharges from abandoned mines became effective, even though such condition resulted from events which occurred prior to their effective date. *See Creighan v. Pittsburgh,* 389 Pa. 569, 132 A. 2d 867 (1957).

Whether it is a "taking of property" to require Barnes & Tucker to treat or abate the discharge from Mine No. 15 is a more difficult question. The power of the Attorney General to abate public nuisances is an adjunct of the inherent police power of the Commonwealth. There is often a thin line separating that which constitutes a valid exercise of the police power and that which constitutes a taking. The United States Supreme Court has abnegated any generally applicable standards in this area, but the classic rule of *Lawton v. Steele,* 152 U.S. 133 (1894), is instructive.

"To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." *Id.* at 137.

From our prior discussion it is clear that the public interest requires the interposition of the Commonwealth's authority in this case. Furthermore, since the activity involved is a public nuisance it cannot be regulated, but must be abated. We believe that abatement of water pollution is unquestionably a reasonable exercise of the police power in the abstract. We are not swayed in this belief by the fact that the mining activity

act otherwise forbidden by any laws of the Commonwealth of Pennsylvania or of the United States."

which gave rise to the present condition is past conduct which obviously cannot now be abated. *See, e.g., Commonwealth ex rel. Chidsey v. Black,* 363 Pa. 231, 69 A. 2d 376 (1949) (decree entered requiring defendants to remove all of the material in existing spoil piles from past strip mining, or take necessary steps to prevent the discharge of acid mine drainage therefrom into waters of the Commonwealth); *Commonwealth v. Ebersole,* 59 Lanc. L. Rev. 363 (Pa. C. P. 1965) (upheld conviction under The Clean Streams Law against defendant who permitted the leaching from his landfill to flow into waters of the Commonwealth). *See also People v. New Penn Mines, Inc.,* 212 Cal. App. 2d 667, 28 Cal. Rptr. 337 (1963), wherein post-mining discharge was held to be within California's water pollution statute.

We recognize that when the Commonwealth brings an equity action to abate a public nuisance its right to relief is not restricted by any balancing of equities, nor by any rule of damnum absque injuria. *Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co.,* 367 Pa. 40, 79 A. 2d 439 (1951); *Commonwealth ex rel. v. Philadelphia & Reading Coal & Iron Co.,* 50 Pa. D. & C. 411 (Phila. C. P. 1944). The exercise of the police power is nevertheless restricted by the parameters of reason. Whether the Commonwealth's use of such power in this case would be unduly oppressive upon Barnes & Tucker would naturally depend on the relief granted. The prayer for relief was for the abatement or treatment of the discharge from Mine No. 15. On the present record it would be impossible for this Court to fashion an appropriate decree. The precise nature of relief which would be warranted and reasonable in this case must rest with the chancellor who may need to take additional testimony and make additional findings of fact in so determining.[16]

---

[16] The possibility of sealing and isolating Mine No. 15 so as to prevent future discharges may exist, but the feasibility of such re-

Accordingly, the decree of the Commonwealth Court is reversed, and the matter remanded for proceedings consistent with this opinion. Costs on appellee.

Mr. Justice MANDERINO took no part in the consideration or decision of this case.

---

lief was not directly addressed below. Much of the testimony below was concerning the mines adjacent to Mine No. 15, the barriers and cut throughs between them, the quantity and quality of water generated in each of the mines, the amount of fugitive water migrating into Mine No. 15, and whether, but for the fugitive waters, any discharge would occur at Mine No. 15. We believe a finding in regard to the sources of water being discharged from Mine No. 15 would be relevant in a determination of the appropriate relief. In this regard we note a key distinction from the situations present in *Commonwealth v. Harmar Coal Co.* and *Commonwealth v. Pittsburgh Coal Co.*, 452 Pa. 77, 306 A. 2d 308 (1973). Those cases involved the *pumping* of water from abandoned mines in connection with the *operation* of working mines. In the present case we are essentially dealing with a natural discharge (but for the pumping at Duman Dam) from an *abandoned* mine which may include acid mine drainage which originated in adjacent abandoned mines.